**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**KRYSTAL KING, et al.,**

     **Plaintiff(s),**   **CASE NUMBER: 03-71778**
              **HONORABLE VICTORIA A. ROBERTS**

**v.**

**ENTERPRISE LEASING CO. OF**
**DETROIT d/b/a Enterprise Rent-A-Car,**
**Enterprise Fleet Services and/or**
**Enterprise Car Sales,**

     **Defendant(s).**
_____/

**ORDER**

## I. INTRODUCTION

This matter is before the Court on: 1) Defendant's Motion for Summary Judgment against each Plaintiff; 2) Defendant's Motion to Strike the Declaration of Jonathan Berns and Exhibits 11, 19 and 21 to Plaintiff's Omnibus Response; and 3) Plaintiffs' Motion to Strike Exhibit A Attached to Defendant's Omnibus Reply Brief .

## II. BACKGROUND

Plaintiffs, one current[1] and nine former[2] employees of Defendant Enterprise Leasing Company of Detroit ("Enterprise"), allege they were denied promotional

_____

[1]Demetrius Brock.

[2]Krystal King, Catherine Stabler, Arthur Henderson, Sandra Bell, Rinell Starks, Deborah Wells, Lois Wilson, Michelle Wilson, and Lorenza Threatt.

opportunities because of race or in retaliation. Additionally, some Plaintiffs allege that Enterprise took other adverse employment actions against them, such as termination or discipline, because of race or retaliation.

Enterprise operates a rental-car business in Southeast Michigan and Northwest Ohio. Enterprise also sells automobiles and leases fleets of cars to corporations. Enterprise's rental operations are divided into four geographic regions. Between 2000 and 2003, Plaintiffs worked in Region W, which covered Wayne County, Michigan. During that time, Region W was divided into five areas (201, 202, 203, 204, 205) and each area had five branches. An Area Manager was assigned to each of the five areas and they each reported to Regional Rental Manager Robert Eisenberg. Eisenberg reported to Regional Vice President Kevin Moore.

In the "Daily Rental" division of Region W, employees are classified as follows in ascending order of management responsibility: Management Trainee (Level I); Management Assistant (Level I); Assistant Branch Manager (Level I); Branch Manager (Level II); Area Manager (Level III); Regional Rental Manager (Level IV). Most full-time daily rental employees are hired as Management Trainees.

**A.     Promotion Criteria from May 1999 to October 2000**

**i.     Management Trainee to Management Assistant**

From May 1999 to October 2000, an employee had to pass a test called the "MQI" in order to be promoted from Management Trainee to Management Assistant. Before being allowed to take the MQI, an employee had to take the Rental Skills test. To be eligible to take the Rental Skills test, the employee had to: 1) accumulate at least

100 "power points" in the prior month or as a 3 month average by selling a certain percentage of Defendant's insurance products to rental customers; 2) have an average daily insurance rate ("ADIR") of $26 per car; 3) have 3 corporate leads in the prior or current month; and 4) have 10 car sale leads in the prior or current month. After taking the Rental Skills test, an employee would be eligible to take the MQI if he had at least 110 power points for the prior month, an ADIR of at least $26 per car, 5 corporate leads in the prior month, and, in non-airport branches, 10 car sale leads in the prior month. Employees were also evaluated based on previous disciplinary actions, performance evaluations, punctuality, attitude and morale. Even if all of the objective prerequisites were met, the Area Manager and/or the Regional Rental Manager (with occasional input from the Regional Vice President) had discretion to decide whether and when to allow an employee to take the MQI.

### ii. Management Assistant to Assistant Branch Manager

To be promoted to Assistant Branch Manager, an employee had to have at least 110 power points in the preceding month or an average of 110 power points over the preceding 3 months. The primary subjective criterion was leadership skills. But, consideration was also given to disciplinary records, performance evaluations, punctuality and attitude.

### iii. Assistant Branch Manager to Branch Manager

When deciding whether to promote an employee to Branch Manager, greater emphasis was placed on the employee's branch performance with respect to the

branch's profitability, fleet growth, employee development, and ESQi scores.[3]  The

decision was also based on the number of employees promoted under the Assistant

Branch Manager, any accounts the employee positively influenced (for example, by

increasing business or securing an account from a competitor), performance

evaluations, disciplinary actions, and leadership skills.

**B.    The "Matrix"**

In October 2000, Defendant began using a monthly "matrix" to assess an

employee's eligibility for promotion.  Through the matrix, Defendant evaluated

employees on a number of objective criteria relative to individual and branch

performance and ranked each employee against other employees within the same job

title.  The top 50% of employees in each position were "shaded" on the matrix.  In

addition to any other criteria, employees seeking promotion had to be shaded in the

prior month.

The testing procedure for promotion also changed.  In order to take the MQI for

promotion from Management Trainee to Management Assistant, an employee had to be

shaded on the matrix and pass four qualifying tests.  The Area Manager also

considered information in an employee's personnel file, such as information about

performance, morale and punctuality.

To be promoted to Assistant Branch Manager, an employee had to be shaded on

the matrix.  The Area Manager also considered leadership skills, prior discipline,

_____

[3]The parties do not indicate what ESQi is an acronym for, but it is the percentage
of customers who indicated that they were completely satisfied with their Enterprise
experience at each branch during monthly follow-up service calls.  Enterprise retained a
third-party service to conduct the customer surveys.

performance evaluations, punctuality, attitude and morale.

To be promoted to Branch Manager, an employee had to 1) be shaded, and 2) have an ESQi at or above the corporate average or show significant positive impact during his time in the position. Pl. Omnibus br., Exh. 7. The Area Manager also considered the employee's leadership skills, ability to train employees and get them to meet their performance measurements, secure new business, and the number of other employees promoted under that employee. Def. Omnibus br., Exh. 3 at ¶18.

Similar criteria were used to decide whether to promote an employee to Area Manager, with greater emphasis on the four core areas: profitability, growth, employee development, and ESQi. *Id* at ¶¶13, 18. The decision to promote an employee to Area Manager rested with the Regional Vice President.

### C. Post-Matrix Promotion Criteria

In February 2003, Enterprise stopped using the matrix in its promotion decisions and established a new set of objective and subjective guidelines. Per Enterprise, the new guidelines principally followed the criteria under the matrix but also formalized consideration of the business environments which varied region to region. The only Plaintiff employed with Enterprise when the February 2003 criteria went into effect was Demetrius Brock; he was an Assistant Branch Manager. In order to qualify for a promotion to Branch Manager, he was required to meet objective criteria which included 1) a 6 month ESQi at or above the company average, and 2) either (a) an average per-car sales rate at or above the company average for the preceding 6 months, or (b) a personal power rating of 85, as averaged over the prior 3 months. Factors militating against promotion included tardiness, insubordination and poor interactions with

customers and colleagues.

### D. Job Postings

Enterprise says that since 2000, it has had two means of notifying employees about open Branch Manager and Assistant Branch Manager positions: 1) each daily rental employee ranked as Management Trainee or above is sent an internal electronic communication similar to e-mail ("MSO1"), and 2) postings are printed out at each branch and distributed by Branch Managers to branch employees. Enterprise says the only exception is when an employee is laterally transferred into an open position--that is, moved from one branch to the same position at another branch.

Plaintiffs dispute Defendant's claim regarding the scope and regularity of job postings. Plaintiffs say that Defendant's claim about its posting procedures is inconsistent with its written policy, which only requires that MSO1 postings for Branch Manager (Level II) positions be sent to Area Managers and above, and that postings printed out at each branch be sent to Branch Managers and above. Per Plaintiffs, there is no posting policy for Assistant Branch Manager vacancies, except that they be communicated within the Region, and there is no evidence of any such postings. Moreover, Plaintiffs say they were often unaware of open Assistant Branch Manager and Branch Manager positions until after they were filled. Defendant maintains that it gave notice of Assistant Branch Manager and Branch Manager positions, but says that it did not consistently begin keeping records of job postings until (perhaps) sometime in 2002.

### III. STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox*, 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact.  Rule 56(e); *Cox*, 53 F.3d at 150.  The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint.  *Copeland*, 57 F.3d at 479.  The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party.  *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV.    APPLICABLE LAW AND ANALYSIS

### A.    Generally Applicable Law

Plaintiffs bring their claims under the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981 ("1981") and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. §37.2101, *et seq.*  Both statutes prohibit race-based employment discrimination.  Section 1981 states:

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. §1981(a)-(b).  Similarly, §37.2202(1)(a)-(b) states that is unlawful for an employer to:

> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

> (b) Limit, segregate, or classify an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status.

Claims brought under §1981 and ELCRA may be proven with direct or circumstantial evidence.  When a claim is based on circumstantial evidence, as is the case for all of the Plaintiffs here, the *McDonnell Douglas*[4] burden shifting approach applies.

Under *McDonnell Douglas,* the plaintiff has the initial burden to prove a *prima facie* case by a preponderance of evidence.  *Texas Department of Community Affairs v Burdine,* 450 U.S. 248, 252-253 (1981).  "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee."  *Id* at 254.  A plaintiff's burden at the *prima facie* stage is not onerous; it is easily met.  *Id* at 253.  But, the burden of persuasion is on the plaintiff at all times. *Zanders v National Railroad Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir. 1990).

The burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  *McDonnell Douglas*, 411 U.S.

---

[4]*McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973).

at 802.  Defendant only has the burden of production.  "[D]efendant need not persuade the court that it was actually motivated by the proffered [legitimate, non-discriminatory] reasons." *Burdine,* 450 U.S. at 255.  The presumption of discrimination is rebutted "if the employer articulates lawful reasons for the action; that is, . . . the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision [was not] motivated by discriminatory animus." *Id* at 257.

The plaintiff "must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.  "'A plaintiff can demonstrate pretext by showing that the proffered reason: (1) had no basis in fact; (2) did not actually motivate the employer's actions; or (3) was insufficient to motivate discharge.'" *Singfield v Akron Metropolitan Housing Authority*, 389 F.3d 555, 565 (6th Cir. 2004).

To minimize repetitiveness, the Court will set forth the applicable law common to all of the Plaintiffs and address common arguments before proceeding with Plaintiffs' individual facts and arguments.  Additionally, claims asserted by Plaintiffs in their Complaint but not defended on summary judgment are deemed abandoned.  The Court only addresses those claims for which Plaintiffs presented argument and analysis opposing summary judgment.  Lastly, it became apparent during the Court's review of the motions and responses that there were multiple authors.  Consequently, the Court found instances where evidence relevant to one Plaintiff's claim was presented for or against another Plaintiff.  Therefore, although Plaintiffs' claims were considered

10

individually, the Court sometimes relied upon evidence presented with respect to other Plaintiffs where relevant to a common allegation or defense.

### 1. Failure to Promote

Many of the Plaintiffs allege that Defendant discriminated against them by refusing to promote them in a timely fashion or at all, but that Defendant promoted less or equally qualified Caucasians (or non-African American minorities).  To establish a *prima facie* case of discrimination based upon a failure to promote, a plaintiff must show that: (1) he is a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions.  *Sutherland v Michigan Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003).  *See also Hazle v Ford Motor Co.,* 464 Mich. 456, 463 (2001)(setting forth substantively similar elements for a claim of failure to promote under the ELCRA).

The Court finds that each Plaintiff who asserts that he or she was wrongfully denied promotion established the first three elements of the claim (except where otherwise indicated).  For the first element, it is undisputed that each Plaintiff is a member of a protected class.

To establish the second and third factors, Plaintiffs must prove in part that they "applied" and were "considered" for the promotions at issue.  Several Plaintiffs present evidence (testimony) of specific Assistant Branch Manager and Branch Manager positions in which they expressed an interest but were denied for various reasons.  This evidence is sufficient to satisfy the "applied" and "considered" elements.

Some Plaintiffs, however, base their claim on positions for which they did not

apply.  But, these Plaintiffs contend that under *Dews v A.B. Dick Company*, 231 F.3d 1016 (6th Cir. 2000), the requirement that they applied and were considered for each position is waived because Defendant did not consistently post notices for open positions and there was no formal mechanism in place for them to apply.  The Court agrees.

*Dews* held that "in failure to promote cases a plaintiff does not have to establish that he applied for and was considered for the promotion when the employer does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion.  Instead, the company is held to a duty to consider all those who might reasonably be interested in a promotion were its availability made generally known."  231 F.3d at 1022.

Many Plaintiffs testified that they did not receive consistent notices through the MSO1 or otherwise.  *See* Pl. Omnibus br., Exh. 26, pp. 329-330 (notices not sent consistently); Exh. 27, pp. 407-408 (same); Exh. 28, p. 356 (same); Exh. 29, pp. 48-49 (same); Pl. Lois Wilson br., Exh. 28 at ¶3 (never received notice of Branch Manager vacancies by e-mail or through printer).  Defendant disputes their claims.  Since 2000, Defendant says notice of every open Assistant Branch Manager and Branch Manager position was sent by MSO1 to all Management Trainees and higher and that notices were printed at each branch.  The only exception was for lateral transfers.  Defendant does not, however, dispute that the process for expressing interest in an open position was informal.  *See* Pl. Bell br., Exh. 33 at pp. 37, 40-41 (Area Manager Ed Belmont testifies that employees simply need to express an interest, verbally or otherwise, to an immediate supervisor to be considered for any available openings in his area).

12

Because there was no formal mechanism for an employee to apply for or express interest in an available position and there is a question of fact regarding whether Defendant posted or otherwise gave notice of all job openings, the *Dews* exception applies for purposes of this motion.

Defendant's assertion that *Dews* only applies if Plaintiffs make "an admissible statistical showing that this alleged policy of 'not posting' disparately impacted African Americans," has no merit. Def. Omnibus Reply at p. 7; Def. Bell Reply at pp. 3-4. *Dews* does not explicitly or implicitly impose such a requirement, and Defendant's reliance on *Donahoo v Ohio Dep't of Youth Services*, 237 F.Supp. 2d 844 (N.D. Ohio 2002), to support its position to the contrary is misplaced.

In *Donahoo*, the Court pointed out that *Dews* cited *Paldano v Althin Medical, Inc.*, 974 F.Supp. 1441, 1446 (S.D. Fla. 1996), in which the Court stated that "the lack of a notice procedure could result in vacancy information being available to only one segment of a work force, and would place no check on individual biases." The *Donahoo* Court opined that "the *Dews* exception was created to address instances in which the failure to post a position results in a segment of the workforce (*e.g.* African Americans) being excluded from promotions." 237 F.Supp.2d 864. Further, with apparent reliance on the *Paldano* language but no explanation of its reasoning, the *Donahoo* Court held that "where there is no evidence that such exclusion or segregation has taken place . . . the *Dews* exception to a *prima facie* case is not applicable." *Id.* Defendant relies upon this language to support its assertion that Plaintiffs must make a showing that the alleged lack of posting disparately impacted African American employees as a group.

*Donahoo,* however, is not persuasive authority because there is no support for its

13

reliance on *Paldano*. The *Dews* Court only cited *Paldano* as one of several circuits which also relieved employees of the obligation to prove the "applied" and "considered" elements when notice of openings are not given or there is no formal mechanism for an employee to express an interest. The *Dews* Court quoted *Paldano* as part of a string citation, but it did not otherwise emphasize the language *Donahoe* relies upon or incorporate it into the ultimate holding. Therefore, there is no apparent basis for the *Donahoo* Court's broad reading of *Dews* as imposing the additional requirement that an employee prove that the lack of notice or procedure excluded a segment of the workforce.

Citing *McEwen v MGM Grand Detroit*, 2006 W.L. 83476 (E.D. Mich. 2006), Defendant also argues that Plaintiffs cannot rely upon *Dews* without statistical evidence that the alleged lack of posting disparately impacted African Americans, since some African Americans were promoted and, if Plaintiffs' claims are true, Caucasian (and other non-African Americans) have been similarly excluded. Defendant's reliance on *McEwen* is misplaced.

The *McEwen* defendant relied upon *Donahoo* to argue that it was immaterial whether job openings were posted, because there was no evidence defendant used "secret" hiring practices to exclude minority employees. The defendant pointed out that, in fact, some minority candidates obtained the positions at issue. In its analysis, the *McEwen* Court noted that *Donahoo* declined to apply *Dews* in part because there was no evidence that African Americans were excluded as a group from applying for available positions. But, the Court did not adopt this rationale or even address it. Rather, the Court stated that it was hesitant to apply *Donahoo* because: 1) it was

14

distinguishable on the facts and, citing *Dews*, 2) the *McEwen* Court recognized that "under the controlling law of the Sixth Circuit, the employer has a duty to ensure that available jobs are available to *all* qualified employees." 2006 W.L. 83476 at * 10 (emphasis added). Therefore, *McEwen* actually supports the position that an employee is not precluded from relying on *Dews* simply because the employer can demonstrate that some people in the same protected class were able to successfully navigate an employer's promotion mechanism. Thus, Defendant's emphasis on the fact that some of its African American employees were promoted despite the alleged lack of notice is unavailing.

Lastly, Defendant contends that *Dews* does not provide for the situation here where there were multiple decisionmakers--five areas supervised by five Area Managers. Each Area Manager decided whom to select for open positions in his or her respective area, and some of the positions Plaintiffs say they were unfairly denied were at branches outside the area covered by their assigned Area Manager. Defendant says, "[i]n this type of situation, one Area Manager simply cannot be held to know that [a Management Assistant] in another area is interested in being promoted to [Assistant Branch Manager] and that[,] therefore, he must consider that [Management Assistant] for all open [Assistant Branch Manager] positions in his area." Def. Bell Reply at p. 3 n. 8.

Defendant's argument is belied, however, by the fact that there is evidence that Area Managers collaborated on promotion decisions. Specifically, Natalie McClinton testified that when she was an Area Manager, there were monthly Area Manager meetings at which they regularly discussed their respective employees. McClinton said

15

that such meetings were used as a vehicle to decide whom to promote:

> Q:  How do you know why Mr. Ford did not take the MQI if he wasn't in your area?
>
> A:  Because as area managers we would talk about our employees. That's how we promote our employees [sic] is through talking about them, talking about what they are doing great at, talking about where they are short, falling short.
>
> Q:  Did you speak to other area managers about how employees in other areas were doing at the time you were an area manager?
>
> A:  We talked about it in our staff managers meetings.
>
> Q:  How often did you have those meetings.
>
> A:  Once a month.
>
> Q:  What types of things did you discuss at those meetings?
>
> A:  We talked about our area's performance, every department gives an update on their department, we -- yeah that's about it.
>
> Q:  And did you discuss specific employees during these meetings?
>
> A:  We discussed all employees.

Pl. Wells br., Exh. 56 at p. 28. When McClinton's testimony is viewed in the light most favorable to Plaintiffs, it is sufficient to refute Defendant's suggestion that Area Managers had no way of knowing that employees outside their own area were eligible and/or interested in promotion.

For these reasons, Plaintiffs are deemed to have applied and been considered for positions which became available and for which they were qualified. The third element and the "applied" portion of the second element is satisfied.

The "qualified" portion of the second element is also satisfied by each Plaintiff (except where otherwise indicated) because they established that they met the objective criteria for the positions they sought. Despite Defendant's urging to the contrary, the Court may not consider an employer's subjective criteria for promoting employees at the *prima facie* stage. Rather, "a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler v White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003). The Sixth Circuit states that a court must consider an employee's qualifications independent of a defendant's proffered legitimate, nondiscriminatory reason because to do otherwise "would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Id* at 574. *See also White v Columbus Metro. Housing Authority*, 429 F.3d 232, 242 (6th Cir. 2005) (holding that an employer's consideration of subjective criteria is not appropriate in the *prima facie* analysis). "In short, a court must be careful not to conflate the distinct stages of the *McDonnell Douglas* test." *Cicero v Borg-Warner Auto., Inc.,* 280 F.3d 579, 585 (6th Cir. 2002). A plaintiff can establish that he or she is qualified, for purposes of a *prima facie* analysis, "by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Wexler*, 317 F.3d at 575-576.

Here, the objective promotion criteria used after the matrix was introduced in October 2000 are set forth in the "20WW Daily Rental Promotional Considerations," and they consist of certain tests and scoring on the matrix and ESQi. *See* Threatt br., Exh. 3. Similar scoring mechanisms were used to measure sales and branch performance

17

before October 2000.  *See* Def. Omnibus br., Exh. 3.

Both before and after the matrix was introduced, Defendant also considered qualities such as punctuality, attitude, morale, leadership, teamwork, dependability and communication skills.  *See* Threatt br., Exh. 3; Def. Omnibus br., Exh. 3.   But, inasmuch as such characteristics cannot be quantitatively assessed and are subject to interpretation, the Court finds that they are subjective and, therefore, may not be weighed at the *prima facie* stage of the analysis.  *See Sempier v Johnson & Higgins*, 45 F.3d 724, 729 (3rd Cir. 1995)("management oriented" skills and "leadership ability" are subjective qualities which the court is prohibited from considering in its *prima facie* analysis).  It also is not appropriate for the Court to weigh performance evaluations, which Defendant also considered, because the evaluations measured a host of subjective characteristics.

Except where otherwise indicated, the Court is satisfied that each Plaintiff demonstrated that he or she met the minimum objective criteria for the promotions at issue.  The "qualified" portion of the second element is met.

The only remaining consideration for the Court is whether each Plaintiff established the fourth element of a *prima facie* claim--that similarly qualified employees who were not members of the protected class received promotions.  To satisfy the fourth element, the Sixth Circuit holds that a plaintiff "need not demonstrate exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Ercegovich v Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)

18

(quoting *Pierce v Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir. 1994)). The

relevant qualifications will vary depending upon the nature of the case. *Id.*

Although the Sixth Circuit in *White v Columbus Metro. Housing Auth.*, *supra,* held

that some comparison between Plaintiff and other employees is necessary in

considering the fourth element of the *prima facie* case, *White* made it clear that any

such comparison should not include "consideration of the employer's evaluation of

subjective traits or other details about why the non-protected person was in fact

selected over the plaintiff." 429 F.3d at 242 n.6. Therefore, in determining whether

Plaintiffs established the fourth element of their *prima facie* case, the Court will only

consider objective qualifications.

## 2.    Discriminatory Discharge

Some Plaintiffs allege that they were fired because of their race. To establish a

*prima facie* case, a plaintiff must show that:

> (1) he is a member of a protected class; 2) he was qualified for his
> job and performed it satisfactorily; 3) despite his qualifications and
> performance, he suffered an adverse employment action; and 4) that
> he was replaced by a person outside the protected class or was
> treated less favorably than a similarly situated individual outside his
> protected class.

*Johnson v University of Cincinnati*, 215 F.3d 561, 572-573 (6th Cir. 2000). *See also*

*Wilcoxon v Minnesota Mining & Manufacturing Co.,* 235 Mich. App. 347, 361

(1999)(setting forth substantively similar elements for claim of discriminatory discharge).

Like the failure to promote claim, the Court finds that the first three elements of

this claim is met by Plaintiffs. They are members of a protected class, the second

element is satisfied for the reasons already stated, and termination is indisputably an

adverse employment action. Therefore, (except where otherwise indicated) the Court will only consider whether Plaintiffs presented sufficient evidence to satisfy the fourth element.

### 3. Retaliation

To establish a *prima facie* claim of retaliation under §1981 and the ELCRA, a plaintiff must prove that: (1) he engaged in protected activity; (2) plaintiff's exercise of protected rights was known to defendant; (3) defendant subsequently took adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Ford v General Motors Corp.,* 305 F.3d 545, 552-553 (6th Cir. 2002); *Meyer v Center Line*, 242 Mich. App. 560, 568-569 (2000).

State and federal courts apply a somewhat different analysis of the fourth element. Under federal law, Plaintiff is only required "to show a causal relationship between the protected conduct and the adverse action." *Smith v City of Holland Board of Public Works,* 102 F.Supp. 2d 422, 429 (W.D. Mich. 2000). "In order to make such a showing, a plaintiff must produce evidence from which an inference can be drawn that his protected activity was likely the reason for the adverse action." *Id.*

Michigan courts impose a higher burden. "To establish causation, the plaintiff must show that his participation in [the protected activity] was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." *Barrett v Kirtland Community College,* 245 Mich. App. 306, 315 (2001). The Court will individually assess whether Plaintiffs asserting this claim carried their burden on each element.

### 4. Constructive Discharge

Two Plaintiffs, Lorenza Threatt and Arthur Henderson, resigned from Enterprise. They assert claims of constructive discharge under state and federal law. However, Michigan does not recognize constructive discharge as an independent claim, *see Vagts v Perry Drug Stores, Inc.*, 204 Mich. App. 481, 487 (1994),[5] and Plaintiffs' federal claim fails on the merits.

The Sixth Circuit in *Hartsel v Keys*, 87 F.3d 795, 800 (6th Cir. 1996), explicitly held that constructive discharge is not the appropriate cause of action for a plaintiff to bring when it is based solely on an employer's failure to promote an employee without other evidence the employer created intolerable work conditions:

> [W]e reject plaintiff's suggestion that she was constructively discharged. Hartsel argues that the Mayor's failure to promote her to what she perceives as her rightful position created intolerable work conditions, such that her preemptive resignation . . . was essentially a firing; she offers no other evidence that shows she was driven out of her prior position. If we were to accept this line of reasoning, every person passed over for a purportedly deserved promotion could bring an illegal discharge suit, and the distinction between the two would be erased. Instead, we treat her allegations as a failure to promote claim.

As in *Hartsel*, Threatt does not offer any evidence beyond his promotion denials which suggests that he was "driven out" of his job. The fact that he alleges that he was denied on multiple occasions rather than one instance as in *Hartsel* is of no moment. Neither the reasoning nor the language in *Hartsel* allows Threatt to maintain a constructive discharge claim on this distinction.

---

[5]"[C]onstructive discharge is a defense against the argument that no suit should lie in a specific case because the plaintiff left the job voluntarily. . . . Thus an underlying cause of action is needed where it is asserted that a plaintiff did not voluntarily resign but was instead constructively discharged." *Vagts*, 204 Mich. App. at 487.

Henderson contends that he stated a claim because in addition to promotion denials, he alleges that Defendant lied to him (on one occasion) about why he was denied, and he was "punished" for complaining about being unfairly passed over. However, there is no reasonable basis to find that one alleged falsehood about why Henderson was not promoted created an "intolerable" work condition. And, the alleged "punishment" to which he was subjected is insufficient to sustain his claim. Part of the alleged "punishment" was Defendant's continued failure to promote him and denial of his transfer requests, which are insufficient under *Hartsel* to establish constructive discharge. The only other "punishment" Henderson identifies is counseling, which cannot reasonably be viewed as punitive. Specifically, Henderson was counseled twice about ways to improve his performance so that he could be promoted and once about a change in his attitude (when he stopped interacting with his Area Manager and Eisenberg and told Eisenberg the reason was that he had nothing to say to them). Pl. Henderson Exhs. 52-54. There is no evidence that any disciplinary action was taken in conjunction with the counseling sessions, and two of them were precipitated by Henderson's request for promotion or transfer.

For these reasons, Defendant's motion for summary judgment on Threatt and Henderson's claims of constructive discharge is **GRANTED**.

### 5. Statistical Evidence and Pretext

In their Omnibus brief, Plaintiffs offer a host of statistics which purportedly show a disparity in the percentage of African Americans promoted outside Area 201 (which

included a number of branches in the City of Detroit[6] or to Area Manager positions, and

that no or few African Americans were selected for Assistant Branch Manager or Branch

Manager vacancies at certain branches (during the relevant time). Based on these

statistics, Plaintiffs generally assert in their Omnibus brief that Defendant cannot

plausibly maintain that it did not take race into account as a factor in job assignments.

Plaintiffs' statistics were compiled by their attorney, Jonathan Berns. Defendant

filed a motion to strike Berns' affidavit regarding the calculations and three tables he

prepared to display them (Pl. Omnibus br. Exhs. 11, 19, 21). Defendant asserts that the

affidavit and exhibits should be stricken pursuant to FRE 702 and *Daubert v Merrell*

*Dow Pharmaceuticals*, 509 U.S. 579 (1993), because Berns does not qualify as a

statistical expert. Defendant also disputes the relevance and validity of the statistics on

multiple grounds, particularly Berns' methodology.

Plaintiffs admit that Berns does not have statistical or other relevant expertise.

But, they argue that expertise is not required and the evidence does not have to meet

the standards of FRE 702 or *Daubert* because the calculations are based upon basic

mathematical computations. In a cross motion, Plaintiffs ask the Court to strike an

expert opinion submitted by Defendant to support its assertion that Plaintiffs'

calculations lack relevance and are based on flawed methodology, because the expert

(Dr. Malcolm Cohen) was not identified prior to the close of discovery and Plaintiffs have

not had an opportunity to depose him or respond.

Motions to strike are governed by FRCP 12(f) and they are generally disfavored.

---

[6]Area 201 includes Branches A4 (Dearborn), B5 (Detroit), D5 (Detroit), G4
(Detroit), 13 (Detroit), 37 (Detroit) and 56 (Hamtramck). Def. Omnibus br., Exh. 1.

*See Lombard v MCI Telecommunications Corp.,* 13 F.Supp.2d 621, 625 (N.D. Ohio 1998). Further, FRCP 12(f) only applies to "pleadings," as that term is defined in FRCP 7(a), which does not include exhibits which accompany dispositive motions. *See Fox v Michigan State Police Dep't.,* 173 Fed. Appx. 372, 375 (6th Cir. 2006)(unpub. op.)("Exhibits attached to a dispositive motion are not "pleadings" within the meaning of Fed. R. Civ. P. 7(a) and are therefore not subject to a motion to strike under Rule 12(f)."); *Lombard*, 13 F.Supp. 2d at 625 (denying motion to strike exhibits to response opposing summary judgment). *See also Kean v Van Dyken*, 2006 W.L. 3256854, *2 (W.D. Mich. 2006); *Rhea v Dollar Tree Stores, Inc.,* 395 F.Supp.2d 696, 702 (W.D. Tenn. 2005).

Nevertheless, the substance of Defendant's motion to strike is largely duplicative of arguments Defendant asserts in its Omnibus Reply as to why Berns' Affidavit and Exhibits 11, 19 and 21 should not be given any weight. *See* Def. Omnibus Reply at pp. 2-6. Although it is not appropriate for the Court to strike the affidavit and exhibits from the record, the Court may disregard them if they are inadmissible, irrelevant or incompetent. *See Lombard*, 13 F.Supp. 2d at 625 ("[A] court should *'disregard'* inadmissible evidence, not strike that evidence from the record.").

The Court will disregard Exhibits 11, 19 and 21 (as well as Berns' affidavit in support of them) because they either are not relevant or are not competent for the intended purpose. Specifically, Exhibit 11 purports to show that there was only one African American Area Manager between May 1999 and May 2003. Exhibit 19 purports to show the racial demographics of Management Trainees and Management Assistants in Area 201 during the same time frame. None of the Plaintiffs, however, relies upon

either exhibit in opposition to summary judgment.  Therefore, neither is relevant to the Court's analysis.

Exhibit 21 purports to show that no or few African Americans where selected for Assistant Branch Manager and Branch Manager vacancies, and that even fewer were selected for those positions outside Area 201.  Six Plaintiffs rely upon Exhibit 21 to establish pretext.[7]  They argue that the purported disparities in the number of African Americans promoted to Assistant Branch Manager and Branch Manager at branches where they sought promotion is evidence of Defendant's discriminatory motive in denying them promotions.

However, at least one apparent flaw in Plaintiffs' proffer is that there is no clear indication that they factored the number of African Americans who were objectively eligible for promotion into their calculations.  Consequently, the statistics do not reflect the percentage of time Defendant passed over *eligible* African Americans for promotion. For example, the fact that African Americans were only selected for 29 out of 109 vacancies (26.6%) for Assistant Branch Manager promotions outside Area 201 would be of little significance if there were only 30 African Americans eligible for the vacancies. Similarly, there would not be any basis to infer a discriminatory motive from the fact that no African Americans were selected (during the relevant time) for certain positions at certain branches if no African Americans were eligible for promotion when the vacancies became available.  Simply put, there is no basis for the Court to draw the inference Plaintiffs suggest without additional information about the pool of African

_____

[7]Threatt, Starks, Henderson, Brock, Wells and Michelle Wilson.

American employees eligible for promotion. *See Frazier v Ford Motor Co.,* 176 F.Supp.2d 719, 724 (W.D. Ky. 2001)(rejecting defendants' reliance on fact that no African Americans had ever been appointed to position they sought because defendants did not present statistical data which suggested systemic disparate treatment or any evidence of the number of African Americans who were qualified or wanted the position).

For these reasons, Defendant's Motion to Strike the Declaration of Jonathan Berns and Exhibits 11, 19 and 21 to Plaintiff's Omnibus Response and Plaintiffs' Motion to Strike Exhibit A Attached to Defendant's Omnibus Reply Brief are **DENIED**. But, Plaintiffs cannot rely upon the proffered statistics or the fact that no or few African Americans were employed as Branch or Assistant Branch Managers at certain branches (inside or outside Area 201) to establish pretext.

**B.    Application of Law to Plaintiffs**

**i.    Lorenza Threatt**

Plaintiff Lorenza Threatt asserts claims of failure to promote and constructive discharge. He was employed with Defendant from December 2000 until he resigned in December 2002. Defendant's motion for summary judgment on Threatt's constructive discharge claim is granted for the reasons stated. The only claim which remains is failure to promote.

In February 2002, Threatt worked in Branch 21 under Area Manager Craig Stacheki. Threatt passed the MQI; Defendant promoted him to Management Assistant on February 28, 2002. After passing the MQI, Threatt told Stacheki and Regional Vice

President Kevin Moore that he was interested in a promotion.  However, Threatt was not shaded on the matrix at the time and Stacheki told him that he should work in Branch 53 (at Metro Airport) for a period of time first.

On June 1, 2002, Threatt transferred to Branch 53.  His Area Manager was Tim Klein.  Threatt became shaded two months later in August 2002 and continued to be shaded through November 2002.  He again expressed interest in a promotion to Klein and Moore.

In September 2002, Defendant became aware of widespread "padding" or "performance cheating" at Branch 53.  "Padding" or "performance cheating" occurred when an employee manipulated a rental contract to falsely inflate his sales numbers.  After an investigation, Defendant issued a disciplinary action to all Management Trainees and Management Assistants at Branch 53, including Threatt.

Threatt complains that Defendant failed to promote him to several available Assistant Branch Manager positions after he became shaded in August 2002.  Instead, he says Defendant chose lesser or similarly qualified Caucasian employees.  Defendant says Threatt was not promoted because he was not qualified.  Specifically, Defendant says Plaintiff had poor sales performance (as reflected in the fact that he was not shaded from March through July 2002) which Threatt attempted to mask by padding his sales numbers in September 2002.

Threatt identifies several Caucasian employees who were promoted after he became shaded and who he says were comparable in all relevant respects.  Mandy Morylak, Christina Skelton and Kristina Paluch worked with Threatt at Branch 53 for a period of time as Management Trainees.  On September 5, 2002, they took the MQI to

27

become Management Assistants and were interviewed for open Assistant Branch Manager positions at other branches on the same day.  Threatt was not offered an opportunity to interview and there is no evidence he knew about the openings.  Morylak and Skelton passed the MQI; Defendant promoted them to Management Assistants on September 5th and to Assistant Branch Managers (at Branches 34 and 28, respectively) on September 16, 2002.

Morylak and Skelton (and presumably Paluch) received the same disciplinary action for padding that Threatt received.  But, Defendant says they each had better sales numbers than Plaintiff.  Morylak and Paluch were shaded in every matrix in 2002 prior to their interview, and Skelton was shaded in the matrices ending March 2002 and July 2002.  Plaintiff did not become shaded until August 2002.

Threatt also points to Michael Trudeau.  Trudeau worked at Branch 29 at the time and also interviewed for a promotion to Assistant Branch Manager on September 5, 2002.  Area Manager Stacheki selected Trudeau for a position at Branch 21. Trudeau was promoted and transferred to Branch 21 on September 16, 2002.   There is no evidence Threatt knew about or was considered for the position.

Threatt contends that Trudeau was less qualified because he had less favorable performance evaluations and he was not shaded in the last matrix issued before his promotion.  Threatt argues that the lack of shading means Trudeau was not even eligible for promotion under Defendant's objective criteria.

Lastly, Christen Bolsley was already an Assistant Branch Manager in September

2002. She was transferred from a smaller branch to a larger one.[8] Though technically this was a lateral move, Defendant concedes for the purpose of this motion that lateral transfers to larger branches are considered promotions. *See* Def. Michelle Wilson Reply at p. 2 n. 6. Threatt says Bolsley was chosen over him even though she performed poorly at the smaller branch. That is, she was not shaded in the August 2002 matrix or in two of the three months prior to her promotions. And, he says that her ESQi scores were less favorable than his. Threatt does not present any evidence to refute Defendant's assertion that Bolsley did not have to be shaded since she was already an Assistant Branch Manager. But, he contends that her scores and standing on the matrix are "a critical measure of her performance at the relevant time." Pl. br. at p. 6 n.3.

The Court finds that Threatt presented sufficient evidence to establish a *prima facie* claim. The first three elements are met for the reasons stated, *supra* at Section IV(A)(1), and, for the fourth element, Threatt identified similarly situated Caucasian employees who were promoted.

The only objective requirement for promotion from Management Assistant to Assistant Branch Manager was that the employee be shaded. *See* Pl. Exh. 3. Because Plaintiff was shaded in August 2002, he was similarly situated in all relevant respects to Morylak, Skelton and Trudeau. The fact that the positions were offered by different Area Managers than Threatt was working under at the time does not distinguish him from the other employees in a material way in light of Area Manager McClinton's

---

[8]Per Defendant, the size of a branch is determined by the number of cars in its inventory. Def. Michelle Wilson Reply, Exh. 1 at ¶2.

testimony that Area Managers regularly met and discussed their respective areas and employees when making promotion decisions.  Pl. Wells br., Exh. 56 at p. 28.  *See also Seay v Tennessee Valley Authority*, 339 F.3d 454, 480 (6th Cir. 2003)(employees who worked in different departments under different supervisors were similarly situated with respect to the comparative discipline they received because plaintiff's discipline was discussed amongst a group of management employees who were aware of the discipline imposed on the other employee when they decided upon the discipline plaintiff would receive); *McMillan v Castro*, 405 F.3d 405, 414 (6th Cir. 2005)("[T]he requirement that a plaintiff and her comparator 'must have dealt with the same supervisor' to be considered similarly situated does not automatically apply in every employment discrimination case."; the rule is flexible based on the facts of the case); *Duncan v Koch Air,* 2005 W.L. 1353758, *3 (W.D. Ky. 2005)("Special circumstances could change the [same supervisor] analysis.  For instance, if the two decision makers knew of their decisions or coordinated their decisions the inference [of discrimination] might be permissible.").

Threatt is not, however, similarly situated to Bolsley.  As he acknowledges, she was already an Assistant Branch Manager at the time of her transfer.  Even though the move was a promotion for her, Threatt does not dispute Defendant's assertion that she was evaluated under different criteria than Management Assistants seeking to move up to Assistant Branch Manager.  Specifically, it was not necessary for her to be shaded.  And, Defendant states in the 20WW Daily Rental Promotional Considerations that "[a]ny employee transfers to other offices . . . do not necessitate specific quantitative requirements."  Pl. Exh. 3.  To be similarly situated, employees must be "nearly

identical" in the relevant aspects. *Pierce*, 40 F.3d at 804; *Seay*, 339 F.3d at 479. Because of the different criteria for promotion to a larger branch and promotion to a higher level position, Threatt and Bolsley are not similarly situated in the relevant aspects.

Finally, although it is not absolutely necessary for analysis of Threatt's *prima facie* claim, the Court will address his assertion that Trudeau was not shaded in August 2002; several other Plaintiffs make the same argument. Contrary to Threatt's assertion, there is no cognizable evidence that Trudeau was not shaded when the decision to promote him was made. Threatt points out that the matrix covering June through August 2002 lists Trudeau's position as Management Assistant. And, Area Manager Stacheki testified that the "position" column on the matrix represents the position an employee held at the time it was printed after the end of the last month covered. For example, a matrix covering January 2002 through March 2002 may not be printed until April 10, 2002. If a promotion was granted between March 31, 2002 and April 10, 2002, the position column would reflect the new position even though the balance of the document only covers the employee's performance through the end of March.

Therefore, Threatt contends that Trudeau's listing as Management Assistant in the August 2002 matrix shows that he could not have been promoted *before* the August 2002 matrix was issued as Defendant contends; to follow his reasoning, the matrix would have shown the new position--Assistant Branch Manager. Threatt asserts that Defendant contradicted its assertion to the contrary in arguments made against Co-Plaintiffs Rinell Starks and Arthur Henderson. In footnotes in the Reply briefs for Starks and Henderson, Defendant says Trudeau was interviewed *and* promoted on September

31

5, 2002.  Additionally, in Defendant's brief against Starks, Defendant suggests that Morylak and Skelton were promoted after the issuance of the August 2002 matrix, by counting their shading in that and prior months as a distinguishing factor between Starks and them.  Threatt points out that Morylak and Skelton were interviewed and their promotions went into effect on the same dates as Trudeau.

The problem with Threatt's argument is that it would require the Court to draw inferences based on arguments rather than evidence.  In their Reply briefs against Starks and Henderson, Defendant cites the affidavit of the Human Resources Generalist Manager for Region W, Sara Lehnis (hereinafter "Lehnis" or "H.R. Manager Lehnis"), in support of their assertions.  Contrary to Defendant's representation in its brief that Trudeau was interviewed *and* promoted on the same day, September 5, 2002, Lehnis only states that he was promoted *based on* his September 5th interviews.  She further says that, because the August 2002 matrix had not yet been issued, Defendant relied upon the matrix ending July 2002 to qualify Trudeau.  Lehnis does not indicate when the August 2002 matrix was issued or when the promotion decision was made.

There is no cognizable evidence to refute Lehnis' claim that the decision to promote Trudeau was based upon the July 2002 matrix.  And, the fact that Trudeau is listed as a Management Assistant on the August 2002 matrix lacks significance without evidence of the date that the August 2002 matrix was issued *and* the date the promotion decision was made.  There is also no basis for the inference Threatt asks the Court to draw from Defendant's argument in its brief against Starks which suggests that Morylak and Skelton were promoted after the August 2002 matrix was issued.  Defendant does not cite any document in the record in support of the argument, and Defendant's

arguments are not evidence.  Moreover, even though Trudeau, Morylak and Skelton were interviewed and their promotions went into effect on the same day, there is no evidence the promotion decisions were also made on that date or, in any event, that the August 2002 matrix was issued before then.  Therefore, even if the Court could rely on Defendant's unsupported arguments, there is still insufficient evidence to support the inference urged by Threatt (and other Plaintiffs).  The Court must accept Lehnis' unrefuted representations.

Turning to the second and third stages of the *McDonnell Douglas* analysis, Defendant articulates a legitimate, nondiscriminatory reason for failing to promote Threatt--that he was not qualified because of his historically low sales scores and his September 2002 disciplinary action.  Threatt, however, established by a preponderance that Defendant's asserted reasons are a pretext.  Defendant's assertion that Threatt's disciplinary action was a factor weighing against him is undermined by the fact that Morylak and Skelton received the same disciplinary actions.  And, Defendant's claim that Threatt's historically low scores was an impediment is contradicted by evidence that at least one other Caucasian employee with historically low scores was nevertheless promoted.  Timothy Enright was promoted to Assistant Branch Manager on February 1, 2002 despite the fact that he was only shaded twice in the prior 15 months.  *See* Pl. Exhs. 37-51.

Defendant's motion for summary judgment on Threatt's claim of failure to promote is **DENIED**.

      **ii.**    **Sandra Bell**

Plaintiff Sandra Bell (formerly Sandra Heath) asserts claims of failure to promote and retaliation. She was employed with Defendant from August 1998 until she resigned on December 20, 2001.[9]

### a. Failure to Promote to Management Assistant

Bell's first claim is that Defendant delayed in allowing her to take the MQI for a significantly longer time than similarly situated Caucasian employees--22 months. Shortly after Bell began working for Defendant and until October 2000, the objective criteria for taking the MQI was that an employee had to pass the Rental Skills test and have at least 110 power points for the prior month, an ADIR of at least $26 per car, 5 corporate leads in the prior month, and, in non-airport branches, 10 car sale leads in the prior month. From August 1998 through February 2000, Bell's Area Manager was Natalie McClinton, who is African American. Bell passed the Rental Skills test on July 14, 1999, but she did not take the MQI while working under McClinton. In March 2000, Bell began working under Area Manager Mark Gummerman, who is Caucasian. Gummerman allowed Bell to take the MQI four months after she began working under his supervision--on July 1, 2000. Bell passed and was promoted to Management Assistant.

Bell does not base her claim that she was inordinately delayed in taking the MQI on the 18 months she was under McClinton's supervision. She bases her claim solely on Gummerman's failure to allow her to take it for four months after he became her Area Manager. This claim fails at the *prima facie* stage, however, because Bell failed to

---

[9]Bell was deemed to have resigned after she failed to show up for work for three days.

establish that she met the objective qualifications to take the MQI prior to the date she finally did.

Bell presents no evidence that she met any of the objective requirements to take the MQI prior to July 1, 2000. She instead argues that she repeatedly asked Gummerman about the MQI and that he only said that she was not ready. Because Gummerman did not specifically say that she had not met all the requirements, Bell seems to assert that the Court can infer that she did and suggests that Defendant must affirmatively prove otherwise.

Bell misapprehends her and Defendant's burden of proof. "The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact." *Chao v Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The moving party is not required to come forward with "evidence" demonstrating the absence of a genuine issue of material fact on issues for which the nonmoving party bears the burden of proof. *Celotex Corp. v Catrett*, 477 U.S. 317, 325 (1986). Rather, the burden on the moving party may be discharged by "showing" -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Id.* "Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. . . . [The nonmoving party] must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment." *Chao*, 285 F.3d at 424 (citations omitted).

Bell has the burden to establish each element of her failure to promote claim, including that she was objectively qualified for promotion. *Sutherland*, 344 F.3d at 614; *Hazle,* 464 Mich. at 463. But, she failed to come forward with any evidence which shows that she met the necessary prerequisites for taking the MQI prior to July 1, 2000. Therefore, Defendant's motion for summary judgment on this claim is **GRANTED.**

### b.    Failure to Promote to Assistant Branch Manager

Bell says she was passed over for a number of Assistant Branch Manager promotions. She expressed an interest in promotion on July 21, 2000 during her performance evaluation, 20 days after she was promoted to Management Assistant. Pl. Exh. 11. Gummerman, who was still Bell's Area Manager at the time, appears to have signed off on the evaluation (the signature is not entirely legible). Bell also testified that she told Gummerman and another Area Manager she worked under for a time, Tim Klein, of her ambitions. Pl. Exh. 1 at pp. 316, 321. She told the same to Craig Stacheki, who was still a Branch Manager when she worked under Klein, during a career counseling session on March 28, 2001. Pl. Exh. 27. Gummerman acknowledged that at some point Bell told him she was interested in a promotion, and he appears to have signed off on another performance evaluation on January 23, 2001 in which Bell again listed promotion to Assistant Branch Manager as a goal. Pl. Exh. 8 at p. 42; Exh. 12.

Bell says that she applied for positions available in at least five branches which were awarded to similarly situated Caucasian employees. She further says a host of other promotions (34) for which she was eligible (but apparently did not apply) were

granted to similarly situated Caucasian employees between July 1, 2000 and December 20, 2001.

Defendant asserts that it is impossible to determine whether Bell was passed over for a Caucasian employee in any of the positions for which she applied because she is unable to give the dates that she applied. Presuming that Bell applied for positions which were filled with Caucasians at an appropriate time, however, Defendant disputes whether Bell was similarly situated with any of them.

The Court finds that Bell identified at least one Caucasian employee with whom she was similarly situated who was promoted at one of the branches to which she applied. Mike Glynn was promoted to Assistant Branch Manager at Branch 55 on March 16, 2001. Bell and Glynn were both shaded in the month prior to Glynn's promotion. Defendant asserts that Bell cannot establish that she was passed over for Glynn because she has not articulated when she applied for a position at Branch 55 and two African Americans were promoted to Assistant Branch Manager at Branch 55 as well. However, even if Glynn's position was not the one for which Bell applied, the *Dews* exception applies for the reasons stated *supra* at Section IV(A)(1). Therefore, Defendant was bound to consider all employees who might have reasonably been interested in promotion even if they did not apply. *Dews*, 231 F.3d at 1022. Beyond the fact that Bell was objectively qualified for the promotion, there is evidence that Bell made her interest in an available position known just two months prior during the January 23, 2001 evaluation which Gummerman signed on January 29, 2001. Therefore, there was reason for Bell's superiors (specifically the Area Managers who collaborated about whom to promote) to know that she may have been interested in

37

promotion.  Bell met her *prima facie* burden.

Defendant does not clearly offer a legitimate, nondiscriminatory reason for not promoting Bell to the position at Branch 55.  Defendant's motion must be denied for this reason alone.  However, even if the Court presumes that Defendant intended to rely upon its assertion that Bell was not qualified because of weaknesses identified in her January 23, 2001 performance review and the disciplinary actions she received in May and June 2001,[10] Defendant's reasons are rebutted.  Glynn was promoted in March 2001, months before Bell was disciplined in May and June 2001.  And, although Bell was found in her performance evaluation to be lacking in certain areas, she was rated overall as "meet[ing] requirements" in her January 2001 performance review and H.R. Manager Lehnis testified that less than stellar performance evaluations were not necessarily a hindrance to promotion.  Pl. Starks br., Exh. 52 at pp. 26-27.  Lehnis' testimony is bolstered by the fact that Caucasian employees who also received negative feedback during evaluations were promoted.  *See* Threatt br., Exh. 19 (Morylak review); 21 (Trudeau review).  This evidence is sufficient to raise a question of fact regarding whether Defendant's presumed reasons for failing to promote Bell is pretext.

Defendant's motion for summary judgment on this claim is **DENIED**.

###    c.    Retaliation

A second reason Bell alleges that Defendant failed to promote her to Assistant

_____

[10]In her January 2001 performance evaluation, Bell was rated as requiring improvement in attitude and disposition, sales and customer service.  Def. Exh. 16.  In May and June 2001, she was disciplined four times on various grounds, including absenteeism, violation of underwriting procedures and a cash box shortage.  Def. Exhs. 17, 18.

Branch Manager is because of her complaints of race discrimination. While at Branch 55, between April 1, 2000 and March 15, 2001, Bell says she was subjected to racially charged comments by Caucasian superiors and co-workers.[11] The exact date is uncertain, but sometime before she left Branch 55, Bell complained about the comments to the Group Human Resources Manager, Patti Lis (hereinafter "Lis" or "Group H.R. Manager Lis"). The comments ceased after Bell's complaint.

Also while at Branch 55, Bell says she made additional complaints of discrimination to Regional Vice President Moore. She complained that: 1) Caucasian employees were being promoted over her; 2) Hawn and Area Manager Gummerman were treating her differently because she is African American; and 3) Gummerman made a comment which she regarded as racially derogatory.[12]

On October 18, 2000, Bell complained to Lis that she was unfairly passed over for promotions. Lis, however, denies that Bell indicated that race was a factor. Rather, in an e-mail memorializing her conversation with Bell, Lis indicates that Bell said Gummerman and Perry repeatedly implied that she was inclined to steal and that Bell was told that she could not be promoted because of an auto accident which left her

---

[11]Branch Manager Phil Hawn and Assistant Branch Manager Tony Perry allegedly called her "darkie" on more than one occasion. Hawn, Perry and co-worker Tim Enright allegedly called her "Slim Shady." And, once when Bell was standing between two Caucasian co-workers, either Hawn or Perry allegedly referred to them as an "inverted chocolate chip cookie."

[12]According to Bell, she told Gummerman that she felt like "a Greyhound dog chasing a steak," referring to her quest for a promotion. Pl. Exh. 1 at p. 184. Gummerman responded by saying "[O]h girly, you all are used to running." *Id.* When Bell asked whether "you all" referred to African Americans or women, Bell says Gummerman said "you know what I'm talking about." *Id.*

disabled for a period of time.  Def. Exh. 14.

On September 4, 2001, Moore asked Bell whether rumors that she planned to file a lawsuit against Defendant were true.  H.R. Manager Lehnis, prepared a summary of Moore's conversation with Bell.  It is not clear whether Lehnis was present for the conversation or if she was simply told what transpired,[13] but Bell apparently relies upon Lehnis' summary as an accurate representation of what occurred.  Per Lehnis, Moore asked Bell if she was planning a lawsuit related to the auto accident or "something else."  Pl. Exh. 30.  Bell denied the rumor, but again raised the issue of her lack of promotion.  Later the same day, Bell received a performance review from her Branch Manager in which she was rated overall as "requir[ing] improvement."  This rating was lower than Bell's prior three reviews, which rated her overall performance as "meets requirements."  Moore testified, however, that he did not see the review until one month later on October 4, 2001.

To establish retaliation under either §1981 or the ELCRA, a plaintiff must prove that: (1) he engaged in protected activity; (2) plaintiff's exercise of protected rights was known to defendant; (3) defendant subsequently took adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Ford,* 305 F.3d at 552-553; *Meyer*, 242 Mich. App. at 568-569.  Bell presented evidence to establish the first three elements.  Her complaints to Moore and Lis are protected activity.  Bell allegedly made the complaints to two high-level management authorities, so Defendant was aware from at least March 15, 2001

---

[13]Moore says he does not remember whether Lehnis was present or if he just relayed the conversation to her.  Def. Exh. 4 at p. 150.

(the last date she was at Branch 55) through the end of her tenure.  For the third element, Plaintiff says Defendant passed her over for at least 15 Assistant Branch Manager positions.  Failure to promote can constitute an adverse employment action. *See Allen v Michigan Department of Corrections*, 165 F.3d 405 (6th Cir. 1999).  And, of the fifteen positions Bell lists, there are at least seven for which she was objectively qualified and similarly situated.[14]

Bell's claim fails, however, on the fourth element--causation.  Under federal law, she has to "produce evidence from which an inference can be drawn that [her] protected activity was likely the reason for the adverse action." *Smith,* 102 F.Supp. 2d at 429. Under Michigan law, plaintiff "must show that [her] participation in [the protected activity] was a 'significant factor' in [Defendant's] adverse employment action, not just that there was a causal link between the two." *Barrett,* 245 Mich. App. at 315.  Bell has not met her burden under federal or state law.

Bell contends that Moore's inquiry about whether she was contemplating a lawsuit on the same day she received a negative performance review establishes a causal connection between her complaints of discrimination and Defendant's failure to promote her.  However, there is no clear connection between Moore's questions about a lawsuit and Bell being passed over for promotion inasmuch as there is no evidence of the extent to which Moore was generally involved in decisions by Area Managers about

---

[14]She was objectively qualified and similarly situated for positions filled on: 1) March 16, 2001 at Branch 55; 2) April 1, 2001 at Branch F3; 3) July 1, 2001 at Branch 21; 4) July 16, 2001 at Branch 09; 5) September 1, 2001 at Branch 21; 6) November 16, 2001 at Branch 28; 7) December 16, 2001 at Branch 13.  Pl. Exhs. 34, 35, 39, 41, 43, 44, 51.  The remaining eight positions were filled with existing Assistant Branch Managers and, therefore, Bell was not similarly situated.

whom to promote (or in Bell's case specifically), that he influenced the decisions, or that any of the Area Managers were aware of the complaints. Moreover, Moore did not ask Bell about a lawsuit until September 4, 2001 and five of the seven Assistant Branch Manager positions for which she was eligible were filled before that date. *See* Footnote 14, *supra*. Therefore, there is no causal connection between Moore's inquiry and the failure to select Bell for those openings.

Defendant's motion for summary judgment on this claim is **GRANTED.**

### iii. Lois Wilson

Plaintiff Lois Wilson asserts claims of failure to promote and discriminatory discharge. Wilson was employed with Defendant from February 29, 2000 until she was fired on March 1, 2002.

### a. Failure to Promote to Branch Manager

Wilson was promoted to Assistant Branch Manager and transferred to Branch 34 on March 1, 2001. Wilson replaced Assistant Branch Manager Hope Fetters, who is Caucasian. Fetters was transferred to a larger branch.

Prior to her arrival, Wilson says Branch 34 had been performing poorly; it had a negative operating profit in three out of the four prior months, the ESQi in the prior month was below the company average, and it had lost an account with a dealership which Wilson contends negatively impacted the branch's fleet growth. After she arrived, Wilson says she was shaded every month, except January 2002. Wilson also claims that the ESQi score improved; it exceeded the corporate average every month from May 2001 through the end of her tenure. And, the branch's average monthly operating

profit improved under her supervision.

The objective requirements for promotion to Branch Manager were that an employee be shaded and have an ESQi at or above the corporate average.  Wilson says she told her Branch Manager, Area Manager Tim Klein and Regional Rental Manager Eisenberg that she was interested in a promotion.  Even though she met the objective requirements every month except February 2002 (because she was not shaded in January 2002), Wilson was not promoted.  Wilson says she was never even aware of Branch Manager vacancies until after they were filled because she did not receive notices via internal e-mail or through the branch printer.

Defendant says Wilson was not promoted because of poor sales and branch performance.  Defendant also says there were complaints from staff about Wilson's management style.  Wilson says that she was not told about staff complaints until she met with Klein and Eisenberg in November 2001.  They told her that an employee complained that she was not properly assisting him with his development.  Klein and Eisenberg also talked about their dissatisfaction with her sales numbers and the branch's performance.

Wilson was again counseled about her performance and management style on January 4, 2002 when Klein gave her a memo stating that immediate improvement was required in sales, fleet growth, operating profit and leadership.  With respect to leadership, Klein said that employees indicated that she spoke to them in unprofessional tones, "causing them to feel belittled and intimidated."  Def. Exh. 6. Klein noted that Wilson failed to improve in the latter area despite their conversation about it in November 2001.

On February 20, 2002, Wilson received the first performance evaluation which rated her overall as "requir[ing] improvment."  She had never before received an evaluation lower than "meets requirements," and in her prior evaluation on August 24, 2001 she was rated between "meets requirement" and "exceeds requirements."  Wilson was fired just under two weeks after the February 2002 review, ostensibly for poor performance.

The first three elements of Wilson's claim are satisfied.  For the fourth element, Wilson identifies three Caucasian employees who were promoted to Branch Manager and who she says were comparable in all relevant respects.  Tim Hubmeier was promoted to an open position at Branch 62 on September 1, 2001.  Brian Pangborn was promoted to an open position at Branch B6 on September 1, 2001.  Jay Teneyck was promoted to an open position at Branch 56 on October 1, 2001.  Wilson was shaded and had the requisite ESQi score at the time of each promotion.  And, the Branch 62 position given to Hubmeier was one of the branches in Klein's area at the time.  So, Klein presumably made the decision to promote Hubmeier.

Defendant argues that Wilson is not entitled to rely upon any evidence prior to November 1, 2001 because she testified that she has no complaint about "the way she was treated" by any Enterprise employee prior to that date.  Def. Exh. 1 at pp. 54, 59-60.  In any event, Defendant contends that Hubmeier, Pangborn and Teneyck are distinguishable from Wilson because they were promoted after serving as an Assistant Branch Manager for 12, 14, and 15 months, respectively.  They had also been working for Defendant for 21, 24 and 23 months, respectively.  Wilson was fired after 12 months as an Assistant Branch Manager, she had been employed for 24 months, and she was

44

not shaded during the last month.  Finally, Defendant says Hubmeier, Pangborn and Teneyck did not have a documented history of complaints from other employees.

The Court finds that Wilson met her burden on the fourth element of her *prima facie* claim.  As a preliminary matter, the Court finds that Wilson may base her claim on promotions she was denied prior to November 2001.  The question posed to Wilson during her deposition regarding whether she had "complaints" about "the way she was treated" was vague at best.  It is certainly debatable whether the question was presented or understood as a request for admission that Wilson was not subjected to racial discrimination prior to November 2001.  In fact, when asked for clarification after the second time the question was asked, defense counsel said that she was referring to treatment by other employees, not Defendant:

> Q (Defense Counsel):  So, between August 24th, 2001 and November 2001 do you have any complaints about the way you were treated yourself while working at Enterprise?
>
> Q (Plaintiff's Counsel):  Let me just ask for some clarification there. Were you asking the way she was treated by other employees or the company in general?
>
> Q (Defendant's Counsel):  Other employees of the company.
>
> A (Wilson):  No, I don't have any complaints.

Def. Exh. 1 at pp. 59-60.  Therefore, the Court is not persuaded that Plaintiff's responses to Defendant's deposition question operates as a waiver of claims which arose prior to November 2001.

The Court further finds that Hubmeier, Pangborn and Teneyck were similarly situated to Wilson in all relevant respects.  The only objective criteria for promotion to Branch Manager was that an employee be shaded and have an ESQi at or above the

45

corporate average. Wilson met both of those criteria. Defendant's attempt to distinguish Wilson from those promoted is unavailing. For the reasons already stated, subjective evidence regarding complaints against Wilson are not properly considered at the *prima facie* stage. *White*, 429 F.3d at 242 n.6. Moreover, the complaints were first brought to Wilson's attention on November 1, 2001. Hubmeier, Pangborn and Teneyck were promoted months prior to that. Lastly, there is no evidence that employment with the company or as an Assistant Branch Manager for a certain amount of time was a prerequisite to promotion. Therefore, Defendant has not established that these distinctions are relevant to the Court's determination of whether Hubmeier, Pangborn and Teneyck were similarly situated.

Defendant articulates a legitimate, nondiscriminatory reason for failing to promote Wilson--that she was not qualified due to poor sales and staff complaints.[15] However, Wilson successfully rebuts this claim. Wilson had higher sales numbers than Hubmeier and Tenecyk according to the last performance matrix issued before they were promoted. And, as stated, there is no evidence of any complaints against Wilson at the time Hubmeier, Pangborn and Teneyck were promoted. Moreover, her performance evaluations just prior to their promotions suggests that she was performing satisfactorily with respect to her subordinates. Specifically, in Wilson's August 24, 2001 review, she received a rating of "meets requirements" on her ability to "train and develop good

_____

[15]In its Reply, Defendant only generally states that its legitimate reason is that Wilson was not qualified. But, in argument Defendant bases this claim solely on her performance after November 2001, because it maintains that she waived all claims prior to that date. It is not clear whether Defendant intended that its argument apply to Wilson's employment prior to November 2001. The Court presumes as much for purposes of this motion.

people" and on her ability to "lead, set good example, train others, and get results." Def.
Exh. 5 at pp. 3-4. Also, Wilson's Branch Manager noted that Wilson was "very good
[with] her relationships [with] employees." *Id* at 3. This evidence contradicts
Defendant's claim that Wilson's sales performance and complaints from staff were the
reasons she was not promoted in September and October 2001.

Defendant's motion for summary judgment on this claim is **DENIED**.

### b.    Discriminatory Discharge

Wilson asserts that race was a factor in the decision to fire her. For the reasons
stated *supra* at Section IV(A)(2), she satisfied the first three elements of a discriminatory
discharge claim. For the fourth element, Wilson identifies four employees (three
Caucasian and one Hispanic) whom she contends were similarly situated but not fired.

Wilson replaced Caucasian employee Hope Fetters as Assistant Branch Manager at Branch 34. Both worked under Klein. Fetters only worked at Branch 34 for
four months. During the last three months she had lower monthly sales numbers than
Wilson had during any month while she was at Branch 34, the branch had a negative
operating profit, and for all four months the branch had worse average monthly
operating profits per car than when Wilson took over. Rather than discharge Fetters,
however, Defendant transferred her to a larger branch, which was a promotion. Fetters
was allowed to continue as an Assistant Branch Manager at the new branch for eleven
months before she was discharged for poor performance.

Caucasian employee Denelle DeLong was an Assistant Branch Manager from
January 1, 2001 to November 30, 2003. In the six performance reviews that DeLong

received during that time, she received an overall rating of "requires improvement" in three of them and she consistently received low ratings in sales. Pl. Exhs. 44, 46-50. In five of the reviews she was rated as "requir[ing] improvement" in sales. And, in the first, which was performed while Klein was her Area Manager, she was rated "unsatisfactory" in sales.

DeLong also received a disciplinary memorandum on December 12, 2002 pointing out that she failed to meet the minimum monthly sales level in November 2002 and warning that continued failure to meet minimum goals would result in further disciplinary action up to and including termination. Pl. Exh. 51. When DeLong was evaluated again in July and December 2003, it appears she reached the minimum monthly sales. But, she continued to be rated poorly in sales. In July, her Branch Manager said her personal sales were "below goals and expectations." Pl. Exh. 49. In December, the same Branch Manager said "[y]our sales continue to be sub-par." Pl. Exh. 50. Nevertheless, DeLong was allowed to continue as an Assistant Branch Manager until November 2003, when she was transferred to a new position (Customer Service Representative).

Angelina Tosqui, who is Hispanic, was an Assistant Branch Manager from April 1, 2001 through October 31, 2002. In all three of her performance reviews, Tosqui was rated as "requir[ing] improvement" in the area of sales. Pl. Exhs. 53-55. In her last review on March 19, 2002, she was rated overall as "requir[ing] improvement." Tosqui also received three disciplinary actions between April and July 2002; two related to poor sales and one related to her unprofessional attitude with customers and employees, and failure to properly develop, respect and support her employees. Pl. Exhs. 56-58. On

November 1, 2002, however, Tosqui was promoted to Branch Manager.

Caucasian employee Christen Bolsley was an Assistant Branch Manager from July 16, 2001 through July 31, 2003. Bolsley received four performance reviews. In two of the reviews she was rated overall as "requir[ing] improvement." Pl. Exhs. 60-63. In each review, she was rated either as "requir[ing] improvement" or "unsatisfactory" in sales. And, she received three disciplinary actions between December 2001 and November 2002 for poor sales. Pl. Exhs. 64-66. On August 1, 2003, Bolsley was transferred to a new position as a Remarketing Assistant.

Wilson established that she was similarly situated with Tosqui. Tosqui's sales numbers were consistently poor; she was disciplined twice over three months for failing to reach the minimum sales levels. Tosqui was also formally disciplined once for her treatment of employees (and customers). Like Wilson, Tosqui allegedly used unprofessional tones and caused employees (and customers) "to feel belittled and intimidated." Pl. Exh. 56. Area Manager Ed Belmont also noted in Tosqui's disciplinary notice that she had already been reprimanded for the same behavior twice, and that she was rated poorly in the same area in a prior evaluation. *Id.* Finally, it appears that at least one person involved in the decision to fire Wilson was also aware of Tosqui's sales and disciplinary record. That is, Eisenberg testified that the decision to discharge an employee had to be approved by Regional Vice President Moore and Human Resources. Pl. Exh. 67 at pp. 22-23. Moore was also carbon copied on Belmont's disciplinary memo to Tosqui and he appears to have signed off on each of her performance reviews. Pl. Exhs. 53-56. However, unlike Wilson, Tosqui was not terminated after failing to improve in either sales or treatment of employees after being

49

reprimanded; she was promoted. The fact that Moore is African American does not

preclude a finding of discrimination because "the idea that one member of a group is

unlikely to discriminate against another member of the same group . . . has been

explicitly rejected by the Supreme Court in the context of race and sex discrimination."

*Wexler*, 317 F.3d at 575 (*citing Oncale v Sundower Offshore Servs., Inc.*, 523 U.S. 75,

78 (1998)).

Defendant contends that Tosqui is not an appropriate comparable employee

because she is Hispanic and, therefore, she is also a member of a protected class.

However, the cases Defendant cites in support of this assertion involved the more

typical scenario of minority plaintiffs comparing themselves to a Caucasian co-worker.[16]

Defendant does not cite, and the Court is not aware of, any published opinions which

address the situation presented here. But, in an unpublished opinion the Sixth Circuit

rejected Defendant's argument. In *Hill v Forum Health*, 167 Fed. Appx. 448 (6th Cir.

2006), the dispute was whether the employee with whom the African American plaintiff

sought to compare herself was Caucasian or Native American. The Court held that in

either case, the other employee was appropriate for comparison because she was not

African American:

> This discrepancy is immaterial. Whether Clawson-Gregg is
> Caucasian or of Native-American descent, the fact remains she is
> not a member of the same protected class as Hill. In other words,
> the fact that Clawson-Gregg is undisputedly not African-American is
> a factor contributing to an inference of discriminatory motive.

---

[16]*See Clayton v Meijer*, 281 F.3d 605 (6th Cir. 2002) and *Perry v McGinnis*, 209
F.3d 597 (6th Cir. 2000). Defendant also cited *Becton v Detroit Terminal of
Consolidated Freightways*, 687 F.2d 140 (6th Cir. 1982), where the Court did not indicate
the race of the employees with whom plaintiff compared himself.

167 Fed. Appx. at 453. This Court finds that Tosqui is an appropriate employee with which Wilson may compare herself because Tosqui is not a member of the same protected class.

Defendant offers a legitimate, non-discriminatory reason for Wilson's discharge-- that her performance was unsatisfactory and she failed to improve after being reprimanded in November 2001. Def. Reply, p. 3 n.9; p. 4 n. 10. Wilson, however, rebuts Defendant's proffered explanation.

One means by which a plaintiff can establish pretext is to show that the claimed reasons she was fired were "insufficient to motivate discharge." *Singfield*, 389 F.3d at 565. Proof by this means "ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer v Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (1994). "[S]uch a showing permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case." *Id.*

Here, as stated, Tosqui had substantially similar performance problems with respect to sales and employee relationships. Yet, Tosqui was not fired. There is sufficient evidence from which reasonable jurors could infer that Defendant's purported reason for firing Wilson was a pretext.

Defendant's motion for summary judgment on this claim is **DENIED**.

### iv. Rinell Starks

Plaintiff Rinell Starks alleges that Defendant failed to promote him to Assistant

Branch Manager because of his race. Starks was employed with Defendant from January 3, 2001 until he resigned on October 25, 2002.

Starks was promoted to Management Assistant on January 23, 2002. He says that he repeatedly expressed interest in promotion to Assistant Branch Manager. Even before he took and passed the MQI, Starks listed promotion to Assistant Branch Manager as a goal in his January 15, 2002 performance evaluation. Area Manager Marcus Sarnovsky also remembers one conversation with Starks on the subject. However, Starks says he was passed over for promotion at least five times in favor of Caucasian employees whom he says were comparably qualified.

Defendant asserts Starks was not qualified for promotion due to his extensive history of disciplinary actions. Between January 15, 2002 and September 13, 2002, co-Plaintiff Demetrius Brock (who was Starks' supervising Assistant Branch Manager) listed 12 negative incidents in Starks' Significant Event Log. Def. Exh. 8. The incidents primarily involved instances where Starks was either late or failed to follow proper procedures in processing rentals. Additionally, Starks was formally disciplined three times. On October 18, 2001, Area Manager Mark Gummerman cited Starks for violating Defendant's underwriting policies by failing to verify that two cash retail customers had automobile insurance, which resulted in a $9,430.65 loss Defendant had to attempt to collect from customers. On May 6, 2002, Defendant cited Starks for failing to meet the minimum monthly sales percentage. And, on July 22, 2002, he received a warning letter about his driving record; he had two traffic violations, including one "chargeable incident" and a moving violation.

Starks points out that Lehnis testified that disciplinary actions do not necessarily

foreclose promotion. Pl. Exh. 52 at pp. 27-28. He also lists other employees against whom disciplinary action was taken but who were promoted. Specifically, Tim Enright was disciplined once before his promotion on February 1, 2002. He was given a warning letter on September 12, 2001 for having two moving violations on his driving record. Enright was later disciplined two additional times in February and March 2002 before being promoted to Branch Manager, once for performance and a second time for one instance of tardiness. Jay Teneyck, who is Caucasian, was promoted to Branch Manager in September 2001 despite a disciplinary write-up in March 2000 for leaving a branch unattended with insufficient personnel to service clients. Tim Hubmeier, who is Caucasian, was promoted to Branch Manager in September 2001 despite a disciplinary write-up in February 2001 for several traffic violations on his record. And, Angela Tosqui, who is Hispanic, was promoted to Branch Manager in November 2002 despite four disciplinary write-ups between April and July 2002 for conduct which included: low ESQi scores, poor attitude/insubordination, and failing to meet the minimum monthly sales average.

The first three elements of Starks' *prima facie* claim are satisfied for the reasons stated *supra* at Section IV(A)(1). He also presented sufficient evidence to satisfy the fourth element. He identified at least four Caucasian employees who, based on Defendant's objective criteria (shading), were similarly situated but promoted although he was not--Tim Enright, Michael Trudeau, Christina Skelton and Mandy Morylak. Like each of these employees, Starks was shaded in the relevant months which preceded

their promotions.[17]

Defendant articulated a legitimate, nondiscriminatory reason for failing to promote Starks--he was not qualified because of his disciplinary history. Def. Reply at p. 5. Citing *Burdine*, Starks argues, however, that Defendant has not met its burden because none of the area managers who selected other employees to fill the positions at issue could recall either why the selected person was chosen or why Starks was not. That is, Starks argues that Defendant's presentation of the disciplinary actions in his personnel file is insufficient since no one other than defense counsel (through argument) cites his disciplinary record as the reason he was denied promotion.

Starks reliance on *Burdine* is misplaced. The *Burdine* Court stated that the employer is required to present evidence to support its proffered reason for rejecting the plaintiff:

> The burden that shifts to the defendant . . . is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection.

450 U.S. at 254-255 (footnotes and internal citations omitted). But, *Burdine* does not require, as Starks suggests, that the employer's evidence include proof that a decisionmaker or other person in authority expressed or somehow adopted the position

---

[17]Defendant shows that Starks was not shaded in the matrices ending March, April and May 2002. Def. Exhs. 27-29. But, Starks shows that he was shaded in the relevant months prior to the challenged promotions, *i.e.*, matrices ending January, February and August 2002. Pl. Exhs. 27, 28, 34.

that the proffered reason was, in fact, the reason for the decision made.  In fact, *Burdine's* holding that "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons" suggests the opposite.  *Id* at 254.  Defendant's submission of evidence of Starks disciplinary record is sufficient under *Burdine* to support the alleged reason he was not offered a promotion.  Defendant met its burden.

Starks alleges pretext on several grounds.  He argues that: 1) Defendant repeatedly passed over him in favor of Caucasian employees who were equally or less qualified; 2) three of the challenged promotions occurred at branches where Defendant only selected two African Americans among those chosen to fill 32 Assistant Branch Manager and Branch Manager positions; and 3) each of the challenged promotions occurred outside of Area 201, where he contends African Americans had limited promotional opportunities.

Starks cannot establish pretext via the second and third grounds for the reasons stated in section VI(A)(5) above.  For his first ground, Starks appears to rely upon the third means of establishing pretext--by showing that the proffered reason was insufficient to motivate Defendant not to promote him.  *Singfield*, 389 F.3d at 565.  Proof by this means typically consists of a comparison of Defendant's treatment of the plaintiff and other similarly situated employees outside the protected class.  *Manzer*, 29 F.3d at 1084.  Since Starks' disciplinary record is at issue, he must identify an employee outside his protected class whose disciplinary record was substantively similar in the relevant aspects.  That is, he must identify employees who engaged in acts which were of "comparable seriousness" to his own infractions.  *Warfield v Lebanon Correctional Institution*, 181 F.3d 723, 730 (6th Cir. 1999).  Starks failed to make this showing.

One of the employees chosen instead of Starks had disciplinary actions against him at the time he was promoted--Enright.  But, Starks cannot reasonably argue that his and Enright's disciplinary record were comparably serious.  Prior to his promotion, Enright received one warning letter for two moving violations on his driving record.  At that time, two disciplinary actions had been taken against Starks.  In October 2001, Starks was written up for violating Defendant's underwriting policies by failing to verify that two cash retail customers had automobile insurance.  In January 2002, he was written up in the Significant Event Log for allowing a renter to use a credit card which was not in his (or her) name.

There is no evidence Defendant regarded Enright and Starks' infractions as comparable, and there is no reasonable basis for finding that they were.  One of Enright's traffic violations occurred in March 1999, over one year before he began working for Defendant.  *See* Pl. Exhs. 9, 53.  There is no indication the second violation occurred during his work hours.  In contrast, Starks' was cited in October 2001 for his failure in two instances to verify that the renter had insurance coverage resulted in a loss to Defendant of over $9,000.  Starks' second write-up in January 2002 was for allowing a renter to use someone else's credit card.

In short, Starks failed to show that his disciplinary record was sufficiently similar to Enright's (or any other employee) to give rise to a finding of pretext.  Therefore, Defendant's motion for summary judgment on this claim is **GRANTED**.

### v.    Catherine Stabler

Plaintiff Catherine Stabler brings three claims: 1) failure to promote to

Management Assistant; 2) discriminatory discharge; and 3) retaliation.  She was employed with Defendant from May 16, 2000 until she was fired on May 11, 2001.

### a.    Failure to Promote to Management Assistant

Stabler was not allowed to take the MQI before she was fired.  From the time Stabler was hired until October 2000, the objective criteria for taking the MQI was that an employee had to pass the Rental Skills test, have at least 110 power points for the prior month, an ADIR of at least $26 per car, 5 corporate leads in the prior month, and, in non-airport branches, 10 car sale leads in the prior month.  Beginning in October 2000 and continuing through the date Stabler was fired, the requirements changed.  An employee had to be shaded on the matrix and pass four qualifying tests ("the RTO2 tests).

Stabler does not claim to have fulfilled the objective criteria before October 2000.  Therefore, she presumably bases her claim on Defendant's failure to allow her to take the MQI after October 2000.  However, Stabler failed to establish that she satisfied the objective criteria in place after that date either.  She was shaded from October 2000 through March 2001.  But, there is no evidence Stabler ever took and passed all of the RTO2 tests.  Stabler testified that she does not remember how many of the tests she took.  Pl. Exh. 2 at pp. 97-98.  But, she contends the Court can infer that she took and passed all of the necessary tests because when she repeatedly asked her Area Manager, Brian DePolo, to allow her to take the test he only told her to continue "selling."  He did not indicate that she had to satisfy any other criteria.  Stabler, however, cannot rely upon this negative inference to meet her burden to affirmatively establish an essential element of her claim--that she was objectively qualified for a promotion.

*Sutherland*, 344 F.3d at 614; *Hazle,* 464 Mich. at 463.

Defendant's motion on this claim is **GRANTED**.

### b.    Discriminatory Discharge

Defendant says Stabler was fired for violating company policies in handling a car rental.  On May 7, 2001, DePolo discovered that two days earlier Stabler voided a rental contract under what he considered questionable circumstances.  On Saturday, May 5th, Stabler was working at Branch 15.  On that day, Stabler rented a car to Freddie Williams, a customer whom she regularly assisted when she worked at Branch 18. Williams sought Stabler out at the new branch when he found out that she transferred. Stabler prepared Williams' rental contract, but had another employee drive him to Branch 01 where the car was located.  Stabler says the employee who dropped Williams off checked him into the car.

The contract indicates Williams rented the car at 11:41 a.m.  Stabler says Williams returned it to Branch 15 approximately one hour later.  Per Defendant, Stabler told her supervisors that Williams said he was returning the car because he did not need it.  But, in her deposition Stabler said Williams told her he was returning the car because of problems with it.  Stabler subsequently voided the contract, presumably without cost to Williams.

When DePolo reviewed the voided contract, he discovered discrepancies and irregularities.  For instance, he inspected the vehicle and found that the interior was messy and all four windows were rolled down.  Also, although Stabler said Williams only had the car for approximately one hour, 151 miles had been driven.  When questioned,

Stabler said she did not thoroughly inspect the vehicle or its mileage when it was returned because Williams had not had the vehicle for long, the branch was already closed, all of the staff except her was gone, and the building was already locked. Stabler said that she just accepted the return, took the keys home with her and voided the contract the following Monday.  In her deposition, however, she stated that she took the keys into the building before she left.

The customer also gave conflicting explanations.  When DePolo contacted Williams, he (Williams) said he returned the vehicle because it was backfiring, contrary to Stabler's claim that he said he simply did not need it.  DePolo called Williams' home a second time one hour later and spoke with Williams' wife.  Contrary to Stabler and Williams' claim that the car was returned on Saturday, Mrs. Williams indicated that they put approximately 100 miles on the car and drove it to church on Sunday.  Mrs. Williams said she did not know when her husband returned the car.  When DePolo called the Williams residence a third time that day, Mrs. Williams said that her husband wanted to know why DePolo called the second time.  She then corrected the information she previously gave him.  Mrs. Williams said that her husband returned the car on Saturday and rented a car from another company.  However, DePolo called the other company to confirm Mrs. Williams' claim and was told that there was no record of a rental by Williams on Saturday.

When DePolo questioned Stabler about the conflict between the mileage and the date she claimed the car was returned, Stabler said that she could not confirm the mileage because she did not check Williams into the car.  Later on May 7th, Stabler was called into a meeting with H.R. Manager Lehnis and Defendant's Business Manager, J.

B. Kloehr. When questioned about the rental, Lehnis indicates in her notes that Stabler's explanation tracked what she told DePolo. When Lehnis asked about the mileage discrepancy, she says Stabler suggested that there may have been an error in the mileage recorded at check-in. But, Lehnis says Stabler admitted that, contrary to company policies, she failed to: 1) get a deposit from Williams prior to the rental, 2) properly check the car in when it was returned, and 3) secure the keys in the office; she took them home instead. So, at the conclusion of the meeting, Stabler was suspended without pay.

Four days later, Stabler met with Lehnis and Group H.R. Manager Lis. Stabler was fired for her handling of the Williams' rental; namely, she was deemed to have violated company procedures regarding deposits, checking in cars and adjusting rates.[18] The rental incident was Stabler's only disciplinary action.

Stabler contends she was fired because of race. She presented sufficient evidence to establish the first three elements of her *prima facie* claim. In satisfaction of the fourth element, Stabler identified an employee outside her protected class who was not discharged under comparable circumstances. In July 2003, Angelina Tosqui (who is Hispanic) was cited for "questionable" rental contracts prepared for one customer. Tosqui allegedly "rented cars at exceptionally low rates, falsified mileage, didn't charge for over-mileage, and failed to take deposits and collect balances," and rented the customer a vehicle on two occasions when money was still owed on a previous rental. Pl. Exh. 33. Regional Vice President Moore and Regional Rental Manager Eisenberg

─────────────────────

[18]In a letter Lehnis prepared about the situation after Stabler was fired, she cited Stabler's failure to secure the keys rather than adjusting rates.

stated that they "consider[ed] this to be a failure to protect company assets and falsification of company documents" and that Tosqui "knowingly cost the company money." *Id.* Yet, Tosqui was only given a written warning.

Although Tosqui's alleged actions were not identical to Stabler's, the conduct was similar in all relevant respects. *See Ercegovich*, 154 F.3d at 352. Tosqui also rented cars to one customer under questionable circumstances, violated multiple policies including failing to get a deposit, and at least some of the alleged conduct (falsifying mileage) was regarded as intentional rather than simply negligent. There is also evidence that at least one of the decisionmakers in Stabler's case was also involved in Tosqui's discipline for similar conduct. That is, Moore approves all discharges and he was directly involved in the discipline of Tosqui. Pl. Lois Wilson, Exh. 67 at pp. 22-23; Pl. Stabler, Exh. 33.

Defendant asserted a legitimate non-discriminatory reason for firing Stabler--her multiple violations in the processing of Williams' rental and return. Stabler, however, rebuts Defendant's proffered explanation. She relies upon the third method of proving pretext--by demonstrating that Defendant's claimed reason was insufficient to warrant her discharge. *See Manzer,* 29 F.3d at 1084. Specifically, Stabler contends that several employees outside her protected class violated one or more of the same policies for which she was fired but were not discharged. Of the employees Stabler lists, the Court finds that Tosqui's conduct, although not identical, was sufficiently similar to satisfy Stabler's burden. The Sixth Circuit in *Warfield*, *supra*, indicated that even if an employee who was treated more favorably did not engage in identical conduct, a plaintiff's burden is met if she shows that the other employee's acts were of

61

"comparable seriousness." The Court finds that Tosqui's alleged misconduct was sufficiently comparable in nature and seriousness, yet she was not fired. Therefore, reasonable jurors could infer that Defendant's proffered reason was a pretext for discrimination.

Defendant's motion for summary judgment on this claim is **DENIED**.

### c.     Retaliation

From January 2001 through March 31, 2001, Stabler worked under then Branch Manager Marcus Sarnovsky at Branch 53.[19]  In February 2001, Stabler learned that another employee pulled and reviewed her contracts.  Stabler says she was told that the employee did so at Sarnovsky's request because he questioned how she was able to sell so well.  Stabler became angry and called Sarnovsky and threatened to quit.  She asked if her work was being scrutinized because she is African American.  Stabler says Sarnovsky, who is Caucasian, denied that he directed anyone to pull her contracts, praised her sales ability and persuaded Stabler to have a meeting with him and Moore the following morning.  When Moore asked why Stabler wanted to quit, she told him that she felt that she was being discriminated against because of her race.  She cited the scrutiny of her contracts and failure to allow her to take the MQI as the basis for her belief.  After Moore assured Stabler that she would eventually be allowed to take the MQI, she opted to stay.  Because she was fired less than four months after this meeting, Stabler contends that the firing was in retaliation for her complaints of discrimination.

---

[19]Sarnovsky was later promoted to Area Manager.

The first three elements of Stabler's claim are satisfied--the complaint was protected activity, Defendant was aware because the complaint was made to Moore who was upper level management, and Stabler's termination was an adverse action. The question is whether she proved the fourth element--that there is a causal connection between the protected activity and the adverse action.

For her federal claim, Stabler is only required to show "a causal relationship" between the protected conduct and the adverse action." *Smith,* 102 F.Supp. 2d at 429. She "must produce evidence from which an inference can be drawn that [her] protected activity was likely the reason for the adverse action." *Id.* For her state claim, however, Stabler must show that her protected activity was a "significant factor" in the adverse employment action, not just that there was a causal link between the two. *Barrett,* 245 Mich. App. at 315.

Stabler contends that the fact that other employees outside the protected class committed transgressions of a similar nature and were not fired establishes the requisite causal connection. Defendant denies that any of the cited employees are sufficiently comparable. And, since Stabler violated multiple company policies after her discussion with Moore and Sarnovsky, Defendant argues that her intervening acts preclude her from asserting that there is a causal connection between her complaints and her firing. Therefore, Defendant asserts that the only remaining basis for finding causation is the timing, which Defendant argues is alone insufficient to establish causation.

Each of Defendant's arguments is without merit. The fact that Stabler allegedly engaged in misconduct between the date of her complaint and the date she was fired does not necessarily preclude a finding of causation. In *Booker v Brown & Williamson*

*Tobacco Co.,* 879 F.2d 1304, 1314 (6ᵗʰ Cir. 1989), cited by Defendant, the Court held that the plaintiff's intervening acts of misconduct precluded him from relying on temporal proximity (less than two months) to establish causation for his state law claim of retaliation. But, the *Booker* Court noted that the plaintiff's intervening acts were a continuation of misconduct for which the plaintiff was previously disciplined.

There is no basis for this Court to broadly read *Booker* to extend to the situation presented here--Stabler was not previously disciplined for any reason and she does not rely solely upon temporal proximity. There is also evidence that a similarly situated employee outside Stabler's protected class was treated more favorably. The Sixth Circuit in *Polk v Yellow Freight System, Inc.*, 801 F.2d 190, 197 (6ᵗʰ Cir. 1986), suggested that timing and additional evidence of a discriminatory motive is sufficient to establish causation. Specifically, the *Polk* Court declined to find causation for plaintiff's state law claim where he offered no evidence beyond timing and stated that "timing alone, without further evidence of an improper motive or action on defendant's part and whether other events intervene, is insufficient to support a finding that defendant's decision to discharge plaintiff was in retaliation." This Court more directly addressed the issue in *Rosteutcher v Midmichigan Physicians Group*, 332 F.Supp.2d 1049, 1064 (E.D. Mich. 2004), when it held with regard to the plaintiff's state and federal law claims that "the combination of proximity in time with other evidence, such as that, following the protected activity, the plaintiff was treated differently from similarly-situated individuals, can suggest a causal connection sufficient to establish a *prima facie* case of retaliation."

Defendant's purported legitimate, non-discriminatory reason--the rental incident--is rebutted for the same reasons stated with regard to Stabler's discriminatory discharge

64

claim.  Defendant's motion for summary judgment on this claim is **DENIED**.

vi.     **Arthur Henderson**

Plaintiff Arthur Henderson alleges constructive discharge and that race was a factor in Defendant's failure to promote him to three positions.  Henderson was employed with Defendant from July 2001 until he resigned in January 2003.

Henderson's constructive discharge claim fails for the reasons stated *supra* at Section IV(A)(4).  The only claim which remains is failure to promote.

a.     **Failure to Promote to Management Assistant**

Henderson alleges that Defendant inordinately delayed in allowing him to take the MQI.  Throughout Henderson's tenure, the objective criteria for taking the MQI was that an employee had to be shaded on the matrix and pass four RTO2 tests.  Henderson finished the RTO2 tests in March or April 2002 and he was shaded from October 2001 through August 2002.  So, Henderson was objectively eligible to take the MQI in March or April 2002.  But, he was not allowed to take it until September 6, 2002.

The first three elements of Henderson's claim are met from March or April 2002 forward.  He failed, however, to establish the fourth element--that other employees with similar qualifications who were not members of the protected class were allowed to take the MQI sooner.

Henderson identifies four Caucasian employees whom he contends were similarly situated--Adam Helm, Matthew Muskan, David Smith and Stacy Ballinger.  He argues that each of these employees was allowed to take the MQI after being employed for a shorter amount of time (9 to 12 months) than he when he took the exam (13

months).  The Court finds, however, that Henderson was not similarly situated with Ballinger and Smith and, even if he was similarly situated with Helm and Muskan, he failed to rebut Defendant's legitimate, nondiscriminatory reason for failing to allow him to take the MQI sooner.

Ballinger and Smith took the MQI on August 1, 2002.  Ballinger worked at Branch 28 and her Area Manager was Ed Belmont.  Smith worked at Branch E7 and her Area Manager was Craig Stachecki.  Henderson never worked at Branch 28 or E7, and he never worked under Belmont or Stachecki.

Without citation to authority, Henderson asserts that it does not matter  if employees with whom he seeks to compare himself did not work under the same Area Manager.  The Court disagrees.

Generally, employees with whom a plaintiff seeks to compare himself must have worked for the same supervisor, under the same standards and conditions.  *See Mitchell v Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992).  The general rule is relaxed when the circumstances dictate a different analysis or, despite there being different supervisors, there is a common decisionmaker. *See McMillan*, 405 F.3d at 414; *Seay*, 339 F.3d at 480.  Henderson, however, has not identified any unique factors about Defendant's procedure for deciding who takes the MQI which warrants departure from the general rule.  And, the evidence indicates that the decision about whom to allow to take the MQI typically rested with the Area Manager assigned to each branch. Moore stated in his declaration that sometimes he, as Regional Vice President, and/or the Regional Rental Manager also participated.  Def. Omnibus br., Exh. 3, Moore Dec. at ¶3.  But, there is no evidence Moore or the Regional Rental Manager (Eisenberg)

66

was involved in any of the decisions at issue.

Applying the general rule to MQI decisions is not inconsistent with the Court's finding that Plaintiffs do not have to prove that employees seeking promotion to Assistant Branch Manager or Branch Manager were working under the Area Manager who made the hiring decision for particular vacancies, because Defendant's established decisionmaking process is different for the MQI. Defendant's procedures permit an employee who seeks promotion to Assistant Branch Manager or Branch Manager to appeal to other Area Managers for available positions in other areas. There is no evidence that the same is true with the MQI; the assigned Area Manager typically is the sole decisionmaker. Consequently, an inference of discrimination does not reasonably follow from the fact an Area Manager for whom Henderson was not working allowed comparable employees to take the MQI sooner. That is, "if two decision makers interpret or apply an employment rule differently and completely independent of one another, the difference in their applications does not tend to prove that one of them is discriminating on the basis of [race]." *Duncan*, 2005 W.L. 1353758 at *3. For this reason, Ballinger and Smith, who worked under different Area Managers, were not similarly situated to Henderson.

Area Manager Tim Klein allowed Helm and Muskan to take the MQI in March and May 2002, respectively, while they were working at Branch 53. During that same time, Henderson was working at Branch 18, under Area Manager Marcus Gummerman. Henderson did not transfer to Branch 53 until June 1, 2002 and only worked there through July 31, 2002.

Henderson established that, like Helm and Muskan, he met the objective criteria

to take the MQI while he worked under Klein.  But, it is not clear whether Helm and

Muskan should be regarded as similarly situated in light of the fact that they worked

under Klein at a different time than Henderson.  The parties did not cite, and the Court

did not find, authority addressing this issue on the same or similar facts.  But even

presuming that the comparison is not precluded, Henderson failed to rebut Defendant's

legitimate, nondiscriminatory reason for failing to allow him to take the MQI sooner--that

he was not qualified for promotion before September 2002 because of performance

deficiencies, which included tardiness, slow customer service and failure to assist in

maintaining branch appearance.

To establish pretext, Henderson argues that similarly situated Caucasian

employees with lesser qualifications were promoted faster.  Presumably, he is referring

to Helm, Muskan, Smith and Ballinger.  Smith and Ballinger were not similarly situated

for the reasons stated.

Muskan was not similarly situated because he did not have similar performance

deficiencies.  Muskan's six month performance evaluation (presumably the only one

before he was allowed to take the MQI at nine months) was favorable in all of the areas

Defendant claims Henderson was deficient.  Muskan was rated as "meets" or "exceeds"

requirements in all areas, while Henderson was rated as requiring improvement in

customer service and maintaining branch appearance in his six-month and one-year

reviews.[20]

_____

[20]Oddly, the parties present two different six-month reviews, completed a week
apart.  Pl. Exh. 6; Def. Exh 4.  The ratings in each are similar, although the review
Defendant presents is slightly less favorable and appears to omit several pages.
Neither party acknowledges that two evaluations were conducted or explains why.

Helm also was not similarly situated.  Henderson and Helm were rated similarly in their one-year performance evaluation in the area of customer service at the branch, but Henderson was rated lower on branch appearance and he was cited for tardiness. Additionally, Henderson has not established that Helm was treated more favorably to an extent which gives rise to an inference of discrimination inasmuch as Helm was only allowed to take it one month faster than Henderson.  A one month difference is not an inordinate delay on its face and Henderson does not present evidence which supports a contrary finding.

Defendant's motion for summary judgment on this claim is **GRANTED**.

### b.     Failure to Promote to Assistant Branch Manager

Henderson says that he was denied promotion opportunities in July, September and December of 2002.  There is a question of fact with respect to the September and December promotions.

### 1.     July Promotions

Henderson points out that three Assistant Branch Manager vacancies were filled in branches other than the one in which he was working in July 2002.  However, Henderson failed to establish two elements of a *prima facie* claim for Defendant's failure to promote him to any of those positions--that he was qualified and that similarly situated Caucasian employees were treated more favorably.  The evidence indicates that promotion to Management Assistant, via the MQI, was a prerequisite to a promotion to Assistant Branch Manager.  However, Henderson did not take the MQI until September 2002, two months after the July positions were filled.  And, he has not

presented evidence that any employees outside his protected class were promoted to Management Assistant without having taken and passed the MQI first.[21]  Therefore, Henderson has not proven that he met the minimum, objective qualifications for promotion in July 2002 or that similarly situated employees outside of his protected class were promoted instead of him.

Henderson argues that he would have fulfilled the MQI requirement if Defendant permitted him to take the exam sooner.  But, Henderson's assertion is insufficient to defeat summary judgment because it would require the Court to presume facts for which there is no evidence; namely, that he would have passed the exam if allowed to take it earlier.

## 2.    September and December Promotions

Henderson passed the MQI on September 6, 2002.  The only objective requirement for a promotion to Assistant Branch Manager was that an employee be shaded on the matrix.

Shortly after Henderson passed the MQI, three Assistant Branch Manager positions were filled in other branches by Caucasian employees Mandy Morylak, Christina Skelton and Michael Trudeau.  In December 2002, two other vacancies were filled by Caucasian employees Samantha Clore and David Smith.

The first three elements of Henderson's *prima facie* claim for each position are satisfied.  The final element is also met.  Henderson was similarly situated to each of

_____

[21]In September 2002, Mandy Morylak and Christina Skelton *interviewed* for an Assistant Branch Manager position on the same day they took and passed the MQI. They were not promoted until eleven days later.

the Caucasian employees who were promoted because he, like them, met the only

objective requirement for promotion--he was shaded.

Defendant does not explicitly offer a legitimate, non-discriminatory reason for

failing to promote Henderson in September or December 2002. Defendant only argues

the various reasons it contends that Henderson failed to establish the second and fourth

elements of a *prima facie* claim.[22] Strict application of *McDonnell Douglas* would,

therefore, require the Court to deny Defendant's motion, because Defendant failed to

rebut the *prima facie* presumption that discrimination occurred.

The Court could perhaps presume that Defendant intended to assert its *prima*

*facie* arguments as its legitimate non-discriminatory reasons for failing to promote

Henderson. However, such a generous reading of Defendant's briefs would be

---

[22]Defendant argues that Henderson was not qualified and/or not similarly situated to each of the employees hired because: 1) between August and November 2002, he was cited on the Significant Event log three times for insubordination (September) and poor customer service (August and November); 2) he was cited for tardiness in his one-year performance evaluation (in July 2002); 3) he was rated as requiring improvement in certain areas of customer service in his six-month and one-year performance evaluations (January and July 2002); 4) he worked under a different Area Manager than the one who promoted Morylak and Skelton; 5) he had only worked as a Management Assistant for just under four months when he resigned, whereas Trudeau and Smith worked in that capacity for 8 ½ and 4 ½ months, respectively, before they were promoted; and 6) Clore was shaded in each of the four months between the date Henderson was promoted to Management Assistant and when he quit, but Henderson was only shaded in two of the four months.

Note that Henderson rebuts some but not all of these arguments. He presents evidence to refute numbers 4-6. But, for numbers 1-3, he does not identify any employee who had the same combination of deficiencies--tardiness, poor customer service and significant event citations. And, he does not dispute Defendant's characterization of his performance. Therefore, if Defendant had clearly articulated its arguments, its motion would likely have to be granted on these claims because Henderson does not rebut Defendant's claim about the quality of his performance relative to those chosen.

inappropriate because: 1) the Court would also have to presume which of the myriad reasons Defendant intended to assert with respect to each promotion, and 2) Defendant failed to address the omission even after Henderson pointed it out in his Response.

Therefore, Defendant's motion for summary judgment is **DENIED** with respect to Henderson's September and December 2002 failure to promote claims, but it is **GRANTED** with respect to the July 2002 failure to promote claim.

### c. Failure to Promote to Account Executive

In September, shortly after Henderson was promoted to Management Assistant, he applied for an opening as an Account Executive in the Car Sales Department. The Car Sales Department sells used vehicles retail. The Account Executive position was the entry-level position in that department.

The objective criteria for the Account Executive position was that the applicant have a successful sales record in Daily Rental products (100+ power rating) and "car sales referrals." Pl. Exh. 61. In November 2002, Caucasian employee Troy Derkos was chosen for the position instead of Henderson. Henderson contends that his race was a factor in Defendant's decision.

The first three elements of Henderson's claim are not in dispute. Defendant only argues that the claim fails on the fourth element; that Derkos was not similarly situated to Henderson because Derkos outperformed him in sales. That is, from June through August 2002, Derkos' branch had a car count of 130 and he had 106 power points, while Henderson's branch car count was 112 and he only had 98 power points. Also, from July to September 2002, Derkos' branch had a car count of 162 and he had 96

power points, while Henderson's branch car count was 85 and he had 95 power points.

Neither party explains what the "car count" represents and how it factors into the criteria set for the Account Executive position. But, Henderson does not refute Defendant's claim that Derkos outperformed him in that area as well as the power rating. Instead, Henderson asserts that he and Derkos were similarly situated because they both: 1) worked in Region W; 2) were routinely shaded on the matrix; 3) had strong sales; and 4) had comparable one-year performance evaluations. Henderson also points out that Derkos received a disciplinary action in September 2002 and was never promoted to Management Assistant.

With the exception of their sales ratings, the similarities Henderson identifies between himself and Derkos are insufficient to establish that he was similarly situated with Derkos. The only objective criterion listed in the job posting was "a successful sales record in Daily Rental products (100+ power rating) as well as car sale referrals." Pl. Exh. 61. Henderson may be correct that he and Derkos' sales ratings were strong. But, Henderson does not dispute that Derkos' ratings were better (even if only marginally). In *Pierce v Commonwealth Life Insurance Co., supra*, the Sixth Circuit stated that "[i]n order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those . . . employees who he alleges were treated more favorably."[23]

_____

[23]*Pierce* involved a Title VII claim, rather than a §1981 claim. But, the same standards of proof apply to both claims. *See Johnson,* 215 F.3d at 573 n. 5; *Harvis v Roadway Express, Inc.,* 923 F.2d 59, 61 (6th Cir. 1991).

40 F.3d at 802.  Henderson did not make this showing.  Defendant's motion for summary judgment on this claim is **GRANTED.**

### vii.    Demetrius Brock

Plaintiff Demetrius Brock is still employed with Defendant as a Branch Manager. He began his career with Defendant in 1994 as a car prep.  Between 1994 and 2003, Brock held various positions: Customer Service Representative, Management Trainee, Management Assistant, and Assistant Branch Manager.  He alleges that Defendant failed to promote him to the positions of Management Assistant and Branch Manager in a timely fashion because of his race.  He also alleges that, while he was an Assistant Branch Manager, Defendant discriminated against him by failing to give him the job title and pay of a Branch Manager even though he performed Branch Manager duties.

### a.    Promotion to Management Assistant

Brock became a Management Trainee in January 1999.  He worked at Branches B5 and 56 under Area Manager Natalie McClinton until March 1, 2000 when he transferred to Branch 53 under Area Manager Tim Klein.

In order to be promoted to a Management Assistant, Brock had to take the MQI. However, he could not take the MQI until he passed the Rental Skills test and had at least 110 power points for the prior month, an ADIR of at least $26 per car, 5 corporate leads in the prior month, and, in non-airport branches, 10 car sale leads in the prior month.  Brock testified that McClinton scheduled him to take the Rental Skills Test on the same day he was transferred to Klein's branch.  Pl. Exh. 1 at p. 124.  Consequently, he did not take the test while working under McClinton and had to wait almost five

months after the transfer, until July 31, 2000. On September 16, 2000, Brock took and passed the MQI. Brock alleges that he was delayed in taking the MQI because of his race.

Defendant does not dispute that Brock established the first and third elements of his failure to promote claim--that he was a member of a protected class and was denied a promotion. But, Defendant contends that Brock failed to establish the second and fourth elements because he was not qualified to take the MQI sooner and there are no similarly situated non-African American employees who were treated more favorably. Defendant is correct.

There is no evidence that Brock satisfied the requisite criteria for taking the MQI prior to September 16, 2000. Brock did not take the Rental Skills Test until July 2000. He contends that McClinton determined that he was ready to take the test in March 2000 but that Klein "cancelled" the test without explanation and delayed it for almost five months. But, there is no evidence Klein "cancelled" the test. McClinton scheduled the test on a date that corresponded with Brock's transfer to a branch outside her authority. There is no evidence Klein was responsible for the conflict, that he was aware McClinton scheduled Brock to take the test or, if he was aware, that it was customary or required that he honor McClinton's determination that Brock was ready to take the test at that time.

Even if Klein should have permitted Brock to take the Rental Skills test on March 1, 2000, there is no evidence Brock achieved the other benchmarks which were a prerequisite to taking the MQI before September 16, 2000. Brock suggests that the Court must infer that he met these prerequisites because Defendant has not proven

otherwise. However, the burden is on Brock to affirmatively establish each element of his failure to promote claim. *Sutherland*, 344 F.3d at 614; *Hazle,* 464 Mich. at 463.

Because Brock failed to establish the second element of his claim, it is not necessary for the Court to reach Defendant's assertion that he also failed to establish the fourth element. Defendant's motion for summary judgment on this claim is **GRANTED.**

### b. Promotion to Branch Manager

Brock was promoted to Assistant Branch Manager in October 2000. He held that position until he was promoted to Branch Manager in April 2003. In the interim (and before), Brock repeatedly expressed an interest in promotion to Branch Manager. While he was still a Management Assistant, Brock advised management during his performance evaluation in May 2000 that he wanted to become a Branch Manager. In his July 2001 review (after he had been promoted to Assistant Branch Manager), Brock and his Branch Manager set goals that he needed to reach by January 2002 in order to become a front runner for Branch Manager. In January 2002, Brock had not reached any of the goals set in July 2001, but he again affirmed that his goal was to become Branch Manager. Finally, in June 2002, Brock discussed his desire for a promotion with his supervisor. Also, Area Manager Edward Belmont says that it was understood that all employees wanted to be promoted. Pl. Exh. 18 at p. 135. Brock says his promotion was delayed due to his race.

Between August or September 2001 and September 2002, Brock says Defendant overlooked him for five available positions in favor of non-African American

employees at Branches 62, 09, B6, 56 and 13.  Defendant says Brock failed to establish a *prima facie* claim for any of those positions because he did not apply for the positions or express a general interest in any available position, and he was not similarly situated to those chosen.

Defendant is correct that Brock failed to establish a *prima facie* claim for three of the positions he identifies at Branches 09, 56 and 13.  The objective criteria for promotion to Branch Manager was that an employee had to 1) be shaded, and 2) have an ESQi at or above the corporate average.  Pl. Omnibus br., Exh. 7.  An employee could, alternatively, satisfy the second criterion by showing "significant positive impact" during his time in the position.

Area Manager Tim Klein selected Caucasian employee Tammy Turner for the Branch Manager opening at Branch 09 in August or September 2001.  However, Turner was already a Branch Manager at the time and, therefore, she was not required to meet the same objective criteria as employees seeking a promotion from Assistant Branch Manager.  *See* Pl. Exh. 9 ("Any employee transfers to other offices . . . do not necessitate specific quantitative requirements.").  It is not even clear that the transfer was a promotion for Turner, as opposed to a lateral move.  Thus, Brock has not established the fourth element of his claim--that he and Turner were similarly situated.

Brock's *prima facie* claim fails with respect to the positions at Branches 56 and 13 because he was not objectively qualified for either position.  Area Manager Marcus Sarnovsky chose Caucasian employee Jay Teneyck for an opening at Branch 56 in September or October 2001.  Brock did not qualify for the position because his ESQi was below the corporate average.  H.R. Manager Lehnis stated in an affidavit that the

ESQi corporate average in August 2001 was 76.  Def. Reply, Exh. 5 at ¶3.  But, Brock's ESQi was only 69, while Tenecyk's was 77.

Brock says he, nevertheless, met the ESQi criteria by the alternate means allowed--by making a "significant positive impact"--by increasing the ESQi at his branch from 62 to 69.  However, he does not present any evidence that Defendant measured this seemingly subjective factor by the amount an ESQi improved over a period of time or that the improvement he made was sufficient to constitute a "significant positive impact."

Brock also did not meet the objective criteria for the position filled at Branch 13.  Area Manager Sarnovsky selected Asian employee Shabi Jafri for an opening on September 1, 2002.  Brock says Jafri was not eligible for the promotion because he was not shaded in the prior month.  Brock bases his assertion on the same reasoning other Plaintiffs used to assert that employee Michael Trudeau was not shaded--Jafri was still listed as an Assistant Branch Manager on the August 2002 matrix and, therefore, he could not have been promoted before it was issued.

Brock relies upon Sarnovsky's testimony to support his position.  But, Sarnovsky testified that he did not remember the date he decided to promote Jafri.  Pl. Exh. 11 at p. 120.  He only agreed that Jafri would not have been eligible for promotion if the August 2002 matrix was in effect at the time of his decision.  *Id.*  In an unrefuted affidavit, Lehnis states that it was not.  Def. Reply, Exh. K at ¶ 2.  Lehnis says Defendant did not even begin compiling the August 2002 matrix until September 3.  Def. Reply, Exh. K at ¶ 2.  The reason, she says, is because the last day of August fell on a Saturday and the following Monday, September 2nd, was Labor Day.  *Id.*  Jafri's

promotion went into effect on September 1, 2002--two days before Defendant began drafting the August 2002 matrix. Pl. Exh. 38. Consequently, Defendant says the relevant matrix for eligibility was July 2002. In the July matrix, Jafri was shaded and had an ESQi of 76. Def. Exh. K. Brock had a higher ESQi but he was not shaded. *Id.* Therefore, Brock was not objectively qualified for the position at Branch 13.

Brock stated a *prima facie* claim for the remaining two positions at Branches 62 and B6, which were filled in August and/or September 2001. Defendant does not dispute that Brock met the first element (member of a protected class) or the "qualified" portion of the second element. Brock's obligation to affirmatively prove the "applied" portion of the second element and the third element (that he was considered and denied promotion) is waived under the *Dews* exception for the reasons stated *supra* at Section IV(A)(1). Lastly, Brock established that he was similarly situated to the Caucasian employees chosen (Tim Hubmeier at Branch 62 and Brian Pangborn at Branch B6) inasmuch as he was shaded and (presumably) his ESQi met or exceeded the corporate average.[24]

The burden shifts to Defendant to rebut the presumption that it failed to promote Brock because of his race. Defendant, however, failed to carry its burden. In its initial brief, Defendant apparently did not anticipate that Brock would base his claim on the positions at Branches 62 and B6 in August and/or September 2001 and only asserted a purported legitimate, nondiscriminatory reason for failing to promote Brock which was

---

[24]Neither party presents evidence of what the corporate average was in July 2001 (the relevant matrix according to Brock and not disputed by Defendant). But, Defendant does not dispute Brock's assertion that he had the requisite ESQi for the Branch 62 and B6 positions.

based on his performance after he was transferred to Branch A4 in January 2002. Def. br. at pp. 10-11. But, after being fully apprised of Brock's claims through his Response brief, Defendant still failed to assert a legitimate, nondiscriminatory reason for failing to promote him to the Branch 62 and B6 positions. Defendant only argued that Brock failed to state a *prima facie* claim.

Because Defendant failed to carry its burden, the Court **DENIES** Defendant's motion with respect to the positions filled at Branches 62 and B6.

### c. Failure to Promote Brock to Branch Manager in Timely Fashion After he was Transferred to Branch A4

On January 16, 2002, Brock was transferred to an Assistant Branch Manager position at Branch A4. At A4, Brock was the highest supervisory employee because no Branch Manager was assigned at the time. When he transferred, Brock says he was eligible for promotion to Branch Manager because he was shaded and had made a significant impact on his prior Branch's ESQi (by increasing it from 62 to 74). But, Brock was not promoted and he performed the duties of a Branch Manager at A4 without a promotion until another African American, Greg Williams, was transferred there as Branch Manager in November 2002. When Williams left in January 2003, Brock again took on the Branch Manager duties until he was promoted in April 2003. Brock contends that Defendant failed to promote him at A4 for 15 months because of his race.

Brock's claim fails at the *prima facie* stage because he has not established that he was minimally qualified for promotion at A4 before he was actually promoted in April 2003. Again, the criteria for promotion to Branch Manager was that an employee had to

80

1) be shaded, and 2) have an ESQi at or above the corporate average or show significant positive impact during his time in the position.  Pl. Omnibus br., Exh. 7. Between December 2001 and February 2003, Brock only satisfied the first criteria of shading three times--December 2001, August 2002 and November 2002.  But, there is no evidence he satisfied the second criterion during those same months.  And, by November 2002, Greg Williams had already been selected to fill the position.

Brock cannot rely on the alternative means of satisfying the second criterion--that he showed a significant positive impact--because on its face this requirement is subjective.  There is no apparent way to objectively quantify whether an employee had a "significant positive impact," and it is inappropriate for the Court to consider subjective criteria at the *prima facie* stage.  *See Wexler*, 317 F.3d at 575.

Defendant's motion for summary judgment on this claim is **GRANTED**.

### viii.    Deborah Wells

Plaintiff Deborah Wells (formerly Deborah Odom) asserts claims of failure to promote, discriminatory discharge and retaliation.  She was employed with Defendant from November 20, 2000 until she was fired on January 8, 2003.

### a.    Failure to Promote to Management Assistant

Wells was not promoted to Management Assistant until 16 months after she began working for Defendant.  She alleges that the delay was due to her race.

Wells failed to establish the fourth element of her claim--that similarly situated employees who were not members of the protected class were promoted more quickly. Wells identifies four employees outside her protected class who were allowed to take

the MQI 9 to 10 ½ months after they were hired--Tim Enright, Matthew Muskan, Evan Moustakas, and David Smith. None of those employees is similarly situated to her, however, because she was not eligible to take the exam within the same time frame.

In order to take the MQI, Wells had to be shaded on the matrix and pass four RTO2 tests. Wells did not pass the RTO2 tests until November 15, 2001 and she was not shaded again until February 2002. Therefore, she was not eligible to take the MQI until March 2002--approximately 14 months after she was hired. She was allowed to take the exam 2 months later.

Also, Muskan, Moustakas and Smith worked under different Area Managers when they were allowed to take the MQI. As with Plaintiff Henderson, the general rule that employees must have worked under the same supervisor in order to be similarly situated applies because the evidence indicates that the decision about when an employee takes the MQI is not a collaborative effort among Area Managers; the assigned Area Manager independently decides when or if an employee in his or her area takes the MQI. *See Mitchell*, 964 F.2d at 583; *Duncan*, 2005 W.L. 1353758 at *3. ("[I]t stands to reason that if two decision makers interpret or apply an employment rule differently and completely independent of one another, the difference in their applications does not tend to prove that one of them is discriminating on the basis of [race].").

Defendant's motion for summary judgment on this claim is **GRANTED.**

### b.    Failure to Promote to Assistant Branch Manager

Wells says she was passed over for promotion at Branches 34 and 29 because

of her race.  She presented sufficient evidence for a *prima facie* claim on the promotion at Branch 29, but she failed to establish at least one element of her claim for the promotion at Branch 34.

On May 1, 2002, Area Manager Tim Klein selected Caucasian employee Amie Elve for promotion to Assistant Branch Manager at Branch 34.  Wells asserts that she and Elve were similarly situated because they were both shaded (the only objective criteria for promotion to Assistant Branch Manager).  However, Elve was a Management Assistant just prior to her promotion and Wells was still a Management Trainee.  Wells was not promoted to Management Assistant until June 1, 2002.  Def. Exh. 15; Pl. Exh. 1.  As stated with regard to Plaintiff Henderson, the evidence indicates that an employee had to first be promoted to Management Assistant to even be eligible for promotion to Assistant Branch Manager.  Therefore, Wells and Elve were not similarly situated.

There is evidence to support a *prima facie* claim for the position at Branch 29. On July 1, 2002, Area Manager Ed Belmont selected Caucasian employee Matthew Muskan for an available position at Branch 29.  Wells was shaded and she testified that she interviewed for the position.  Therefore, the first three elements of her claim are satisfied.   The final element is also met.  Wells was similarly situated to Muskan because she met the only objective requirement for promotion--she was shaded.

Defendant failed to rebut the inference of discrimination because it failed to articulate a legitimate, nondiscriminatory reason for failing to promote Wells, even after she pointed out Defendant's omission in her Response.  As with certain other Plaintiffs, Defendant only argues that Wells' claim fails at the *prima facie* stage.  Defendant

alluded that Wells was not promoted because of an extensive record of disciplinary actions due to her absenteeism. However, Defendant never clearly makes this assertion as its legitimate, nondiscriminatory reason for failing to promote her and it is not incumbent upon the Court to speculate about what Defendant intended. Therefore, Defendant's motion for summary judgment must be **DENIED**.

**c.   Discriminatory Discharge**

Defendants says Wells was fired because of repeated unexcused absences from work. Wells alleges that she was discharged because of her race. Defendant asserts that Wells failed to establish the fourth element of her *prima facie* claim--that a similarly situated non-African American employee was treated more favorably. Defendant is correct.

Wells asserts that Stacey Ballinger and Angelina Tosqui also had attendance issues but were not discharged. There are, however, few parallels between Wells, Ballinger and Tosqui. In two disciplinary memos, Ballinger was disciplined for being 15-60 minutes late on multiple occasions. In one of her evaluations, Ballinger was also cited as often late or absent, although no information was listed regarding how often Ballinger did not come in or whether those absences were excused. Tosqui was cited in one evaluation as not being punctual. Wells on the other hand received four disciplinary memos for being absent from work without permission from 1 to 6 days at a time, and often without calling to advise anyone that she would not be in or why. Def. Exhs. 8, 11, 16, 25. Wells was also twice rated as "requir[ing] improvement" in the area of absenteeism and counseled to improve her attendance. Def. Exhs. 9, 20.

"It is the discrimination plaintiff's burden to establish that . . . other employee's acts were of 'comparable seriousness' to his or her own infraction." *Warfield*, 181 F.3d at 730.  There is no reasonable basis for jurors to find that Wells' repeated, unexcused absences (often without prior notice to her supervisors) are comparable to Ballinger and Tosqui being late on occasion.  And, there is insufficient evidence regarding the frequency with which Ballinger failed to come in (or even if her absence(s) were unexcused) to support a finding that her infraction was comparably serious to Wells'.  Therefore, Wells' claim fails at the *prima facie* stage; she failed to identify any employees who were similarly situated.

Defendant's motion for summary judgment is **GRANTED**.

### d.    Retaliation

On December 31, 2001, Wells spoke with Regional Vice President Moore about various complaints and concerns.  During that conversation, Wells says she told Moore that she was being discriminated against because of her race, specifically because she had not been allowed to take the MQI.  Pl. Exh. 26 at pp. 126-127, 284-285.  Wells says she also asked her Area Manager, Craig Stachecki, if she was not allowed to take the MQI because she is African American.  After she interviewed and was not chosen for Assistant Branch Manager positions, Wells says Stachecki told her that she was not promoted, in part, because of her complaints of race discrimination to Moore.  Lastly, Wells also testified that she believes that race was a factor in her discharge because Stachecki once told her that people like her who "rock the boat" do not "work out well" at Enterprise.  Based on these interactions with Moore and Stachecki, Wells alleges that

Defendant delayed in allowing her to take the MQI, failed to promote her to Assistant Branch Manager, and fired her in retaliation for her complaints of discrimination. Each of Wells' claims fails on the merits.

To establish retaliation, Wells must prove that: (1) she engaged in protected activity; (2) her exercise of protected rights was known to defendant; (3) defendant subsequently took adverse action against her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Ford,* 305 F.3d at 552-553; *Meyer*, 242 Mich. App. at 568-569. To establish causation under state law, Wells must show that her participation in the protected activity was a "significant factor" in the adverse action, not just that there was a causal link. *Barrett,* 245 Mich. App. at 315.

Wells has not established *prima facie* that the "delay" in allowing her to take the MQI was retaliatory. Wells was first eligible to take the MQI in March 2002 while she worked under Stachecki. Her inquiry to him about whether she was not permitted to take it was because of her race was protected activity. Therefore, the first and second elements are satisfied. However, Wells failed to establish that an adverse action was taken against her. Stachecki allowed her to take the MQI two months after she first became eligible. A two-month delay is not an inordinate delay and, therefore, is not adverse on its face. And, Wells does not present evidence of the amount of time other employees had to wait to take the test after satisfying all of the prerequisites. Therefore, there is no basis to find that the delay was atypical or punitive. Finally, Wells failed to clearly indicate what she relies upon to establish the causal connection.

Wells also failed to establish a *prima facie* claim based on Defendant's failure to

promote her to Assistant Branch Manager at Branches 34 and 29. With respect to Branch 34, the failure to promote Wells to the position at Branch 34 was not an adverse action because she was not eligible for promotion when that position became available. The first three elements of her claim with regard to Branch 29 are met, however, because she complained to Moore and Stachecki about discrimination and failure to promote her is an adverse action. But, Wells failed to establish a causal connection between her protected activity and the failure to promote her. That is, there is no evidence that anyone other than Branch 29 Area Manager Ed Belmont made the decision about whom to select or that he was aware of Wells' protected activity when he declined to choose her. Although Stachecki allegedly told Wells that she was not chosen because of her complaints, there is no evidence Belmont was the source of this information or that Stachecki or Moore told Belmont of her complaints.

Lastly, it is questionable whether Wells presented sufficient evidence to establish a *prima facie* claim that she was subject to a retaliatory discharge and, in any event, she failed to rebut Defendant's purported legitimate, nondiscriminatory reason for firing her. Wells presented evidence to satisfy the first three elements of her *prima facie* claim because the complaints to Stachecki and Moore were protected activity, Stachecki was involved in the decision to terminate her (Def. Exh. 5), and termination is an adverse action. However, Wells has not clearly established a causal connection. (She does not even clearly allege it with respect to her discharge, only the failure to promote.) She claims Stachecki told her that people like her who "rock the boat" do not "work out well" at Enterprise. But, there is no evidence regarding when this alleged comment was made relative to her discharge, and she was fired approximately one-year after she

alleged discrimination.

Even presuming that Stachecki's alleged comments are sufficient to establish causation under state and federal law, Defendant rebutted the inference of discrimination by asserting a legitimate, nondiscriminatory reason for her discharge-- pervasive absenteeism. Wells, however, failed to even attempt to rebut Defendant's claimed legitimate reason. She does not allege or present any evidence of pretext.

For these reasons, Defendant's motion for summary judgment is **GRANTED** for each claim of retaliation.

### ix.    Michelle Wilson

Plaintiff Michelle Wilson alleges that race was a factor in Defendant's failure to promote her (by transferring her to a larger branch), discriminatory discharge and retaliation. She was employed with Defendant from June 1997 until she was fired in September 2002.

### a.    Failure to Promote

Wilson began working for Defendant as a Management Trainee in June 1997. Between December 1997 and June 2000, she was promoted to Management Assistant, Assistant Branch Manager and Branch Manager. One year after her promotion to Branch Manager, in May or June 2001, Wilson requested a transfer from Branch B5 to a larger, better performing branch. She expressed interest in vacancies at seven branches but was not chosen for any of them. Wilson alleges that Defendant instead chose an equally or lesser qualified non-African American employee to fill the vacancies at five of the branches (01, 15, 21, 29 and 37) between June 2001 and June 2002.

Wilson's claim fails either at the *prima facie* or pretext stage for each of the positions she says she was unfairly denied. Wilson established the first three elements of each claim. She is a member of a protected class, she applied for (or expressed interest in) vacancies at the five branches at issue[25] and was not chosen, and the Court can infer that Wilson was objectively qualified to fill any of the Branch Manager vacancies because she already held that position and there is no evidence that Defendant had other specific, objective criteria for transfer from a smaller branch to a larger branch (which Defendant concedes for purposes of this motion would be a promotion).

For the fourth element, Wilson only established that she was similarly situated to the employee chosen for one position filled at Branch 29 in December 2001--Wendy Cloutier.[26] Like Cloutier, Williams was an existing Branch Manager seeking promotion

---

[25]Defendant asserts that Wilson did not establish that she applied for each of the vacancies she challenges. There is no merit to Defendant's claim. Wilson testified that she applied or expressed interest in transfer to each of five branches.

Moreover, Wilson needed approval from her Area Manager, Marcus Sarnovsky, Eisenberg, and the hiring Area Manager in order to be transferred. However, Sarnovsky advised Wilson sometime in the latter part of 2001 that he would not support her request for transfer to any location because of her attitude and disposition problems; he said that he would not send her to a location to manage more people until her performance deficiences were corrected. Def. Exh. 18 at pp. 151-153. Eisenberg opposed transferring Wilson for the same reason. Def. Exh. 49 at pp. 130-131. Therefore, even if Wilson did not apply for each of the vacancies challenged, there is sufficient evidence that she expressed an interest in transfer to each of the branches at issue and that Sarnovsky effectively denied her the opportunity to pursue all available vacancies by indicating that he would withhold approval.

[26]There were two positions at Branch 29. The other was filled in June 2001.

to a larger branch.[27]  Wilson was not similarly situated to the employees chosen for the remaining positions at Branches 01, 15,[28] 21, 29 (June 2001) and 37.

To be similarly situated, employees must be "nearly identical" in the relevant aspects.  *Pierce*, 40 F.3d at 804; *Seay*, 339 F.3d at 479.  Wilson is not similarly situated to employees who were promoted to Branch Manager from lower level positions. Caucasian employees Tim Enright and Chuck Williams were chosen for the vacancies at Branches 15 (June 2002) and 37, respectively.  But, they did not transfer from another Branch Manager position.  They were promoted from Assistant Branch Manager.  Promotion from Assistant Branch Manager to Branch Manager was awarded based upon specific criteria which do not apply to a request to transfer.  *See* Threatt Exh. 3, 20WW Daily Rental Promotional Considerations ("Any employee transfers to other offices . . . do not necessitate specific quantitative requirements.").  Because of the different criteria for promotion to a larger branch and promotion to a higher level position, Wilson is not similarly situated with Enright or Williams in the relevant aspects.

Wilson also is not similarly situated to Branch Managers for whom the transfer was not a promotion.  Caucasian employee Corey Webster was chosen for vacancies at Branches 01 and 29 (June 2001).  Phil Hawn, also a Caucasian, was chosen for the vacancy at Branch 21.  And, Hispanic employee Gus Martinez was chosen for a

----

[27]Wilson did not present affirmative evidence that Cloutier's transfer constituted a promotion.  But, Defendant does not dispute the claim.

[28]There were two positions at Branch 15; one in December 2001 and another in June 2002.

vacacy at Branch 15 (December 2001).[29]  Defendant presents unrefuted evidence that

Hawn's transfer was not a promotion because he was transferred to a smaller branch.

*See* Def. Reply, Exh. 3.  And, Wilson has not presented evidence which conclusively or

inferentially establishes that Martinez or Webster's transfers were promotions.[30]

Inasmuch as Wilson explicitly sought and claims she was denied a "promotion" via a

transfer to a larger branch, she cannot be regarded as similarly situated in the relevant

aspects with employees who, in fact, were not promoted.

 Even if Wilson stated a *prima facie* case for the vacancies at all five branches,

she has not rebutted Defendant's purported legitimate, nondiscriminatory reason for

failing to select her--her difficulty managing employees.  *See* Def. Br. at p. 17.

Specifically, Wilson was repeatedly warned, counseled and disciplined about

demeaning and being rude to subordinates (and customers).  In fact, when someone

else was chosen for the Branch 37 vacancy, Eisenberg and Moore told Wilson that she

was not chosen in part because of her persistent problems with employees; it was

under control at that time, but they wanted to see if the problems would resurface before

---

[29]For the reasons stated with respect to Plaintiff Lois Wilson, Plaintiff Michelle
Wilson is not precluded from comparing herself to Martinez because he is Hispanic
rather than Caucasian.  *See Hill*, 167 Fed. Appx. at 453.

[30]Defendant attempted but failed to conclusively establish that Webster and
Martinez's transfers were not promotions.  Defendant attaches a payroll change form to
show that Webster's transfer to Branch 01 was not "characterized" as a promotion.  Def.
Reply, Exh. 5.  However, the document is inconclusive.  It does not indicate whether
Webster's move to a larger branch was a promotion.  Also, Defendant contends that
Martinez's transfer to Branch 15 was not a promotion because Branch 15 had one less
car than the branch Martinez was transferred from, as of November 30, 2001.  *See* Def.
Reply, Exh. 1, Lehnis Decl. at ¶3.  However, Lehnis did not state and Defendant did not
otherwise prove that the inventory of Branch 15 over two weeks prior to the promotion
necessarily reflected the inventory on the date he was transferred.

putting her in a larger branch. Def. Exh. 2 at pp. 226. Wilson attempts, but fails, to establish that Defendant's asserted reason is pretext through each of the recognized means--by showing that the proffered reason: (1) had no basis in fact; (2) did not actually motivate the employer's actions; or (3) was insufficient to motivate discharge. *Singfield*, 389 F.3d at 565.

First, Wilson contends that Sarnovsky offered a factually inaccurate reason for failing to allow her to transfer to Branch 37. Sarnovsky said that he would not transfer her to a branch with more employees due to her history of attitude and disposition problems. But, Wilson says transfer to Branch 37 would not have involved significantly more employees. Per Wilson, at Branch B5 she managed three or four full-time employees and when she sought transfer there were four full-time employees at Branch 37. In fact, however, the evidence indicates that Wilson only supervised three employees at the time the Branch 37 vacancy was filled, and Branch 37 had six employees--four full-time and two part-time. Pl. br. at p. 16 n.13; Pl. Exhs. 78, 79. Therefore, Sarnovsky's assertion that a transfer would have required Wilson to supervise more employees--twice as many in fact--was accurate. Pretext is not established by this means.

Wilson next relies on the second means of proving pretext by essentially arguing that the fact that no African American was hired as Branch Manager at three of the Branches (01, 15 and 21) shows that her performance problems were not the real reason she was denied. This argument fails for the reasons stated *supra* at Section IV(A)(5).

Lastly, applying the third method, Wilson argues that reasonable jurors could find

92

that her performance problems were insufficient to preclude transfer because Defendant transferred non-African Americans who also had significant ongoing performance issues; particularly Webster, Hawn and Enright.  However, the evidence indicates that from September 1997 through June 2002, Wilson had a history of counseling, discipline and complaints about her attitude towards employees and customers which far exceeded the disciplinary record of any of the employees chosen for the vacancies, including Webster, Hawn and Enright.

Within three months after Wilson was hired through the date the vacancies were filled, she was counseled, warned or disciplined about her attitude with customers and employees as follows:

| | |
|---|---|
| *performance evaluations | 7 times (1997-2001) |
| *warning | 1 time (1999) |
| *disciplinary memos | 3 times (2000-2002) |
| *negative log entries | 6 times (2001-2002) |
| *customer complaint | 1 time (2001) |

Def. Exhs. 8-14, 20, 21, 24, 25, 41, 47.  She also received five disciplinary memos for other performance issues or conduct between April and May 2002.  Def. Exhs. 38, 48. By comparison, none of the employees chosen for the vacancies at issue was disciplined for poor interaction with employees or customers, none of them had more than four disciplinary actions, and only Hawn, Webster and Enright had recurring issues.

Hawn was disciplined three times between August 2000 and June 2001; twice for having uninsured losses which exceeded the corporate average and once for failing to

verify insurance coverage or follow call back procedures for one rental customer. During the same time frame, Wilson was disciplined four times for poor interaction with customers and/or employees.[31]

Webster was disciplined four times between December 2000 and February 2002; once for violating underwriting procedures; once for administrative failings which resulted in a car being stolen, and twice for having a poor ESQi score. During the same time frame, Wilson was disciplined eight times for poor interaction with customers and/or employees.[32] Also, between February 2002 and the date Webster received the second transfer on May 15, 2002, Wilson received two negative log entries. Def. Exh. 47.

Enright, who was not a branch manager prior to his transfer, was disciplined or counseled three times between September 2001 and March 2002; he was counseled once to improve in areas of office management, disciplined once for being tardy, and he received one warning for having two moving violations on his driving record (one of which occurred before he began working for Defendant). During the same time frame, Wilson was disciplined two times for poor interaction with customers and/or employees.[33] Additionally, between March 2002 and the date Enright was promoted to Branch Manager on June 16, 2002, Wilson was disciplined three times for her

---

[31]One disciplinary memo, two negative log entries and one performance evaluation. Def. Exhs. 14, 47, 20.

[32]Four negative log entries, two performance evaluations, one disciplinary memo and one customer complaint. Def. Exhs. 20, 21, 24, 25, 47.

[33]One performance evaluation and one customer complaint. Def. Exhs. 24, 25.

interaction with customers and/or employees and she received five disciplinary memos for other performance issues or rule violations. Def. Exhs. 38, 41, 47, 48.

Neither the quantity nor the substance of the disciplinary actions taken against the employees who were chosen instead of Wilson was sufficiently similar to Wilson's record to establish pretext.

Defendant's motion for summary judgment on this claim is **GRANTED**.

### b.    Discriminatory Discharge

In March 2002, Defendant investigated Wilson for misconduct. Two employees at Wilson's branch told management that Wilson damaged one of the side mirrors on a Chrysler Sebring which was part of the branch's inventory while she was driving it, and that she surreptitiously had the damage repaired. The Sebring was part of the branch's "new car stock," which had never been rented. Branch Managers were allowed to drive such cars with permission from either an Area Manager or Eisenberg. Wilson did not have permission to drive the Sebring.

A car prep at Wilson's branch named Darnell Tyler says that in mid-March Wilson gave him money ($100) and instructed him to take the Sebring to a repair shop, Collision Craftsman, to repair the side mirror. Tyler says he took the car and waited for the repair to be completed. When it was done, Tyler says the repair person would not accept payment from him; he instead told Tyler that he would talk to Wilson about it later. So, Tyler says he returned the car and Wilson's money.

Before the mirror was repaired, Assistant Branch Manager Flora Vann says that Tyler alerted her that the car was damaged and that Wilson asked him to take it for

repair.  Vann inspected the vehicle and saw the damage before Tyler left.  She then reported the damage and Tyler's allegations to Heidi Stechschulte in loss control. Although the timing is unclear, Vann says she also took a call from "Jim" from Collision Craftsman who told her to tell Wilson that the mirror was in.  Plaintiff points out that Stechschulte indicated that Vann gave a slightly different account of the call. Stechschulte told Lehnis that Vann said that she received a call from someone at Collision Craftsman who mistook her for Michelle, told her that the part was in and that she could bring the car down for repair.  Per Stechschulte, Vann said the caller hung up when he/she realized it was Vann.[29]

Regional Vice President Moore questioned Wilson.  She admitted driving the car, but denied knowledge of, or responsibility for, the damage or its repair.  Approximately one week later, Area Manager Sarnovsky and Tyler went to Collision Craftsman to get an invoice for the repair.  However, the manager at Collision Craftsman, Jim, denied any knowledge of the repair.  Thereafter, the investigation was deemed inconclusive because of conflicts between Tyler's account and the manager at Collision Craftsman.

Six months later, on September 25, 2002, Collision Craftsman complained about Wilson.  She allegedly failed to pick up a customer from the repair shop when promised and was rude when someone called to question her about the delay.  Sarnovsky went over to Collision Craftsman to speak with the manager about the complaint.  During the visit, Sarnovsky says the new manager, Pat, and a secretary, Tori, brought up the Sebring without solicitation from him.  Per Sarnovsky, Pat said that he put a new mirror

---

[29]Wilson cited but failed to attach the pages of Vann's deposition (Exh. 6, pp. 58-60) where she was questioned about the discrepancy.

on the car and Tori said that she did not tell him about the repair when he first inquired because the former manager, Jim, was covering it up. Sarnovsky says Pat and Tori also said that Wilson had a social relationship with Jim.

Two days later, Lehnis and Group H.R. Manager Lis went to talk to Pat and Tori. Lehnis and Lis say Pat and Tori gave them the same account they gave Sarnovsky. Additionally, Lis says they said that Wilson complained about Vann (who was Wilson's subordinate) while in their shop (apparently on more than one occasion). Wilson allegedly said that Vann did not know her job.

Wilson continues to deny any involvement with the damage or repair of the Sebring or that she spoke negatively about Vann. She also questions the thoroughness of Defendant's investigation and points out various conflicts in Vann and Tyler's statements.

Defendant says it fired Wilson on September 30, 2002 because: 1) of Collision Craftsman's complaint and its refusal to refer customers to Wilson's branch because of her treatment of its employees; 2) she was (believed to be) dishonest about the repairs to the Sebring, and she did not report the accident; and 3) her (alleged) negative statements about Vann to Collision Craftsman employees were belittling, demeaning and unprofessional. Def. Exh. 40. Wilson argues that she was fired because of her race.

Defendant only disputes the fourth element of Wilson's *prima facie* case--that similarly situated non-African Americans were treated more favorably. Wilson says Caucasian Branch Managers Corey Webster and Jennifer Zarn were not fired despite a number of disciplinary actions for conduct which included dishonesty. Specifically,

between December 2000 and July 2002, Webster was disciplined eight times.  Two instances involved acts of dishonesty.  In December 2000, Webster violated Defendant's underwriting policies by accepting a lower deposit and failing to verify that a customer had full insurance coverage.  And, when the customer returned with damage to the vehicle, Webster wrote up the incident as though the customer had full coverage under a protection plan (presumably Defendant's) even though he did not qualify for it because of his age.  The second incident was in July 2002, when Webster rented a previously impounded vehicle without getting proper clearances but falsely claimed to have gotten authorization for the rental.  He quit one month later.  Webster's other disciplinary actions involved acts of negligence (failing to secure car keys which resulted in a car being stolen), poor ESQi scores, unexcused absences or tardiness, and inappropriate fraternization (asking out an employee who previously worked under his supervision despite policies precluding employees from dating).

Zarn was disciplined eleven times between December 2001 and June 2003.  One instance in June 2003 involved an act of dishonesty.  Per a customer's request, Zarn changed unit and vehicle identification numbers on closed contracts and submitted them for payment.  Zarn's Area Manager admonished her stating that even though the customer asked her to make the changes, her behavior was unethical and constituted a falsification of company documents.  The balance of Zarn's disciplinary actions involved performance (low sales, low EQSi, missed deadlines), customer service errors (failure to pick up client, failure to follow procedures for customer alerts), and violation of Defendant's underwriting procedures (failing to follow rental procedures, once resulting in $12,000 loss).  Eight months after her last disciplinary action in June 2003, Zarn was

fired for unsatisfactory performance.

Comparably, while Wilson was a Branch Manager she was disciplined seven times, had negative log entries eight times and received one customer complaint. Def. Exhs. 14, 21, 25, 38, 41, 47, 48. All but five of the disciplinary actions/log entries were based on her attitude and behavior towards customers and employees. The remainder were for performance deficiencies or rule violations, including driving the Sebring without permission.

Presumably Wilson contends that Webster and Zarn were similarly situated to her because they were disciplined a number of times and some of their conduct included acts of dishonesty. The Court disagrees.

Neither Webster nor Zarn's transgressions can reasonably be viewed as similar to Wilson's. Both had fewer disciplinary/negative actions and their acts of dishonesty were not "of comparable seriousness" to Wilson's alleged conduct with the Sebring. *See Warfield*, 181 F.3d at 730 ("It is the discrimination plaintiff's burden to establish that the other employee's acts were of 'comparable seriousness' to his or her own infractions."). Wilson is alleged to have driven a company car without permission, damaged the vehicle, failed to report the damage, surreptitiously repaired the vehicle and lied about her conduct when confronted. Neither Webster nor Zarn engaged in comparable behavior.

Moreover, Wilson was not fired solely for the one alleged act of dishonesty. She was also fired for alleged inappropriate remarks to a customer about one of her subordinates and for Collision Craftsman's complaint about the same type of attitude problems for which Wilson had been repeatedly disciplined and counseled for several

years.  Neither Webster nor Zarn engaged in the same extensive pattern of behavior or was involved in an incident which included multiple infractions of comparable seriousness to Webster's alleged infractions.

Even if Wilson established a *prima facie* claim, she has not presented sufficient evidence to rebut Defendant's purported legitimate, non-discriminatory reasons for discharging her:  1) Collision Craftsman's complaint; 2) the Sebring incident; and 3) negative comments about Vann which Defendant regarded as unprofessional.  Wilson asserts that she can establish that the reasons given by Defendant are pretext because the stated reasons have no basis in fact, and, even if the allegations of misconduct are true, they did not warrant termination because neither Webster nor Zarn were fired despite acts of dishonesty and a substantial disciplinary record.  There is no merit to either assertion.

To support her claim that Defendant's asserted reasons have no basis in fact, Wilson focuses on the Sebring incident and points out that she consistently denied the allegations.  She further contends that Defendant did not conduct a legitimate investigation into who was responsible for the Sebring damage and repair; that is, they ignored what she regards as significant evidence implicating Vann and/or Tyler.

To demonstrate that Defendant's explanation for firing her is pretext, Wilson "must produce sufficient evidence from which the jury could 'reasonably reject' the [defendant's] explanation' and infer that the defendant[] intentionally discriminated against [her]." *Braithwaite v Timken Company,* 258 F.3d 488, 493 (6th Cir. 2001)(*quoting*, *Woythal v Tex-Tenn Corp.,* 112 F.3d 243, 246-247 (6th Cir. 1997)).  And, when pretext is claimed because the asserted reason for the discharge "had no basis in

100

fact," a plaintiff must establish that "the proffered bases for [his] discharge never happened, *i.e.,* that they are 'factually false.'" *Manzer,* 29 F.3d at 1084.

Wilson has not presented evidence which conclusively establishes that there is no factual basis for the allegations against her, and she cannot show pretext by merely disputing the allegations or questioning the validity of Defendant's investigation. *Braithwaite,* 258 F.3d at 493. Rather, she must "put forth evidence which demonstrates that [Defendant] did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id* at 494 (*citing Smith v Chrysler*, 155 F.3d 799, 806-807 (6th Cir. 1998)). "In order to determine whether the defendant had an 'honest belief' in the proffered basis for the adverse employment action, [the] Court looks to whether the employer can establish its 'reasonable reliance' on the particularized facts that were before it at the time the decision was made." *Id.* That is, courts "do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith*, 155 F.3d at 807. "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* "When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Id* at 807-808.

There was ample evidence to support Defendant's finding that Wilson was involved in the damage to and repair of the Sebring. Tyler gave a statement directly implicating Wilson in the damage and repair. Vann said she saw the damage. Wilson

admitted driving the vehicle without permission for a period of time. During the investigation, Sarnovsky inspected the vehicle and observed that one of the mirrors was clean while the other was dirty, which is consistent with other evidence that one of the mirrors was damaged and repaired. The manager of Collision Craftsman allegedly admitted to Lis, Lehnis and Sarnovsky that he repaired the vehicle and corroborated Tyler's claim regarding Wilson's involvement.[30]

Wilson contends, however, that Defendant conducted a sham investigation to justify firing her, not to find the responsible party. In support of this assertion she points to what she regards as clear and substantial inconsistencies in Vann and Tyler's statements which she says Defendant ignored even though they suggest Vann and/or Tyler's involvement. Specifically: 1) when reporting the damage and Wilson's alleged intention to get it repaired, Vann stated that she knew the car was being used because she saw a car prep (Tyler) driving it; 2) Tyler brought the damage to Vann's attention but asked her not to say anything about it (because he still had to work with Wilson); 3) Vann said Tyler took the car to Collision Craftsman on March 18th, but Tyler said he took it on March 19th; 4) Vann gave conflicting statements about the call she received from Collision Craftsman; and 5) Defendant is unable to explain how Vann knew the repair cost was $85 if her account of the events is true.

To the extent these "inconsistencies" are material (individually or collectively),

---

[30]Contrary to Wilson's assertion, Lis, Lehnis and Sarnovsky's account of what Pat and Tori told them is not hearsay because it is offered to show why they took certain action, not for the truth of the matter asserted. *See* FRE 801(c); *United States v Martin,* 897 F.2d 1368, 1371 (6th Cir. 1990)("The hearsay rule does not apply to statements offered merely to show that they were made or had some effect on the hearer."); *Anthony v DeWitt*, 295 F.3d 554, 563 (6th Cir. 2002).

they are not sufficiently significant to cast doubt on the credibility of Defendant's decisional process. None of these factors exonerates Wilson or rebuts other overwhelming evidence of Wilson's involvement. Therefore, Wilson failed to establish pretext by this means.

Wilson's assertion that Webster and Zarn were not discharged for engaging in similar conduct is also insufficient to establish pretext for the reasons already stated-- neither Webster nor Zarn engaged in "substantially identical conduct." *See Manzer*, 29 F.3d at 1084 (a plaintiff may establish that the proffered reason was insufficient to motivate discharge with evidence that "other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.").

Defendant's motion for summary judgment on this claim is **GRANTED**.

### c.    Retaliation

On June 7, 2002, Wilson met with Lis and General Manager Jeff Enyeart. During the meeting, Wilson says she complained that Caucasian managers were promoted despite engaging in conduct similar to that for which she had been criticized, and that Webster was selected at Branch 29 (in June 2001) because it is a suburban branch and he is Caucasian. Twelve days later, Wilson received a negative performance evaluation; her performance was rated overall as "unsatisfactory." Three months later, Sarnovsky revisited Collision Craftsman and allegedly obtained new information implicating her in the Sebring incident. Wilson was fired shortly thereafter.

Wilson alleges that she was fired in retaliation for her complaints to Lis and

Enyeart.  Defendant disputes that Wilson established the fourth element of her claim--a causal connection between her termination and the complaints to Lis and Enyeart--and asserts the same legitimate, non-discriminatory reasons for firing her as alleged for the discriminatory discharge claim.  Without specifying what evidence she relies upon, Wilson says the evidence offered in support of her discriminatory discharge claim also demonstrates a causal connection and pretext for her retaliation claim.

Wilson presumably relies upon the temporal proximity (three months) between her complaints and her discharge to establish causation.  There is conflicting authority within the Sixth Circuit whether temporal proximity alone is sufficient to establish causation when the adverse action occurs less than six months after the protected activity.  *Compare Singfield*, 389 F.3d at 563 (temporal proximity of three months alone sufficient evidence of causal connection to establish *prima facie* case; no indication the Court relied on other evidence) and *Hafford v Seidner*, 183 F.3d 506, 515 (temporal proximity of two to five months alone insufficient).  Even presuming, however, that Wilson established a *prima facie* case, she failed to rebut Defendant's legitimate, nondiscriminatory reasons for discharging her for the reasons stated concerning her claim of discriminatory discharge.

Defendant's motion for summary judgment on this claim is **GRANTED**.

### x.    Krystal King

Plaintiff Krystal King alleges claims of failure to promote and discriminatory discharge.  She was employed with Defendant from May 16, 2000 until she was fired on July 19, 2001.

a.    **Failure to Promote**

Defendant hired King as a Management Trainee.  She held that position until Defendant fired her.  King alleges she was denied an opportunity to take the MQI and be promoted to Management Assistant because of her race.  Defendant contends that King was not qualified to take the MQI before she was fired.

After October 2000, in order to be eligible to take the MQI an employee had to be shaded and pass four RTO2 tests.  The Area Manager also considered information in an employee's personnel file, such as performance, morale and punctuality.  King contends and Defendant does not dispute that she completed the RTO2 tests by March 2001 and that she was shaded at that point and until she was fired.

In March 2001, King transferred to Branch 53, where she worked under Area Manager Tim Klein and Branch Manager Craig Stachecki until April 15, 2001.  Per King, once she completed the RTO2 tests additional training was required to prepare her for the MQI.  She first requested that training when she transferred to Branch 53.  King says she asked Stachecki and Assistant Branch Manager Brian Pangborn.  Stachecki and Pangborn agreed to provide the necessary training but never followed through.  At the same time, however, King says Stachecki and Pangborn provided training to Caucasian employee Christen Bolsley.[31]  When King asked Stachecki if she could set a target date (of May or June 2001) to take the MQI, she says that he told her that she was "completely unready" to even think about taking it but declined to explain why.  King

---

[31]King also asserts in her brief that Stachecki trained Caucasian employee Jacqueline Dickerson during the same time.  However, in her deposition King actually states that she is unsure whether Stachecki was training Dickerson for the MQI.  Pl. Exh. 1 at pp. 287-289,

then complained to Regional Rental Manager Eisenberg about the lack of training (apparently because her Area Manager, Klein, was unavailable due to an injury. Pl. Exh. 1 at p. 131. Despite her requests and complaint, King did not receive the training before she transferred from Branch 53 to Branch 01 on April 16, 2001.

King worked at Branch 01 from April 16, 2001 until she was fired in July 2001. King does not indicate that she requested training at Branch 01. She only asserts that she asked her Branch Manager, Fadi Awad, to allow her to take the MQI. But, he told her that she would not be ready until she mastered "the back end of the business," meaning certain reports. Pl. Exh. 1 at pp. 346-347.

Despite the fact that she was not allowed to take the MQI at Branch 01, King apparently bases her claim of failure to promote on the fact that she was effectively precluded from taking the MQI while at Branch 53. Only two elements of her *prima facie* claim are in dispute, the second--whether she was qualified--and the fourth-- whether similarly situated non-African Americans were treated more favorably.

The second element is satisfied. By March 2001, King met the objective requirements to take the MQI; she was shaded and passed the RTO2 tests. Defendant contends, however, that she was not eligible to take the MQI because there were concerns about her punctuality, attitude and disciplinary history. However, the Court already found that such factors are subjective and, therefore, may not be weighed at the *prima facie* stage of the analysis.

The fourth element is also met. King identified nine non-African American employees who worked at Branch 53 under Klein at various times who were allowed to

take the MQI.[32]  One of those employees, Mike Glynn, worked at Branch 53 during the same time King was there.  It is not clear whether employees who worked at Branch 53 at different times can appropriately be regarded as similarly situated.  But, at a minimum, King was similarly situated with Glynn because they worked under Klein during the same time and she, like Glynn, satisfied the objective criteria for taking the MQI.

Defendant articulated a legitimate, nondiscriminatory reason for failing to allow King to take the MQI--that she was never qualified to take it before she was fired.[33]  Def. br. at p. 1.  Defendant bases this assertion on King's performance and disciplinary record, particularly counseling and discipline for persistent tardiness, counseling about her attitude (unwillingness to accept criticism from superiors), and counseling and discipline regarding her failure to properly handle "callbacks."[34]

King failed to establish that Defendant's purported legitimate reason was mere pretext.  King attempts to establish pretext by the third means--by showing that employees outside her protected class were treated more favorably despite having substantially similar performance issues.  She identifies four employees who were allowed to take the MQI despite negative notations in their record--Angela Tosqui,

_____

[32]Chuck Williams, Mike Glynn, Christen Bolsley, Jacqueline Dickerson, Evan Moustakas Christopher Huneryager, James Roach, Michael Sloan and Shabi Jafri.  (Pl. Exhs. 2 Ex. 21; Ex. 27, Exhs 28-33).

[33]For the same reasons asserted by Plaintiff Starks, King asserts that Defendant failed to carry its burden because it did not cite admissible evidence to support its purported legitimate, nondiscriminatory reason.  King's argument fails for the same reasons.  See pp. 53-54, *supra*.

[34]It is not clear what "callbacks" entail, but it was one of King's responsibilities.

Christopher Huneryager, James Roach and Stacy Ballinger.

Prior to transfer to Branch 53, King had not been disciplined for any reason and her performance reviews were primarily favorable, except that she was counseled in her 90-day and six-month reviews about her attitude with supervisors and tardiness. Tosqui and Ballinger were also counseled regarding their attitude and tardiness. However, Tosqui and Ballinger obtained approval to take the MQI from a different Area Manager, Ed Belmont, whom King never worked under. As previously stated with respect to other Plaintiffs, there is no basis to infer pretext under these circumstances. Additionally, the performance evaluation for Tosqui which King cites, was completed six months *after* she took the MQI, not three months before as King erroneously states. *See* Pl. Exhs. 34, 35.

King also failed to establish that Huneryager and Roach were treated more favorably for the same conduct. In the performance evaluations completed just prior to their promotion, King points out that both were rated as requiring improvement overall and in sales. In her six month review which was completed before her transfer to Branch 53, King was rated as meeting requirements overall and in sales (and in one category she was rated as exceeding requirements). However, that King was rated higher overall and in sales does not give rise to an inference of pretext, since Defendant claims that her attitude and tardiness were the problem and neither Huneryager nor Roach received a negative evaluation for either.

Defendant's motion on this claim is **GRANTED**.

      **b.**    **Discriminatory Discharge**

After King transferred to Branch 01, she was disciplined several times and counseled once for tardiness. On May 14, 2001, she was placed on two weeks probation. On May 16, 2001, she was advised in her performance evaluation that her tardiness was unacceptable. On June 25, 2001 and July 3, 2001, she received an "Employee Warning Report." On July 6, 2001, she was deemed to be late again and Branch Manager, Awad, reported her tardiness to Lehnis. King, however, attaches documentation which appears to show that she was on time on that date. But, on July 13, 2001, King was late and Awad sent her home. Six days later she was fired for tardiness.

King contends that she was fired because of her race. Defendant does not dispute that the first three elements of her claim are met. But, Defendant argues that she failed to establish, for the fourth element, that a similarly situated employee outside her protected class was treated more favorably. To the contrary, however, King satisfied this element as well.

Branch 01 opened for business each day at 7:30 a.m. All employees were required to arrive at 7:20 a.m. *See* Def. Exhs. I, J; Pl. Exh. 24 at p. 31. Defendant attaches times sheets showing that between April 19, 2001 and July 12, 2001, King arrived after 7:20 on numerous occasions. Def. Exh. X. However, King points out that Caucasian employees Christopher Huneryager and Marino Fortuna, who worked with her at Branch 01 as Management Trainees, arrived after 7:20 a comparable number of times. Between April 16, 2001 and July 19, 2001, Fortuna never clocked in prior to 7:30 a.m. *Id.* Similarly, during the periods April 16, 2001 through May 15, 2001, and June 8, 2001 through June 21, 2001, Huneryager did not clock in prior to 7:30 a.m. *Id.* Yet,

neither was disciplined, counseled or discharged for tardiness.

Defendant contends that King's tardiness was more egregious because, with a limited number of exceptions, Huneryager and Fortuna arrived late but before the branch opened rather than after:

> King's incidents of tardiness were qualitatively different and more numerous than either Fortuna's or Huneryager's combined. . . . The branch opened at 7:30 a.m. . . .There is an obvious qualitative difference between an employee arriving late but *before* the branch opened and one who arrives late but *after* the branch is opened.  Only the latter leaves the branch short-staffed as customers are arriving and expecting service.  The data presented by Plaintiff during depositions shows that King punched in after the branch was opened on fourteen **(14)** separate occasions between April 16, 2001 and July 19, 2001. . . . Fortuna, in contrast, punched in after opening on only seven **(7)** occasions. . . . Similarly, Huneryager punched in after opening on five (5) occasions.  Thus, Huneryager and Fortuna combined punched in after opening less than Plaintiff.  Therefore, neither Huneryager nor Fortuna can be considered similarly situated to Plaintiff, since both neither was tardy to the same extent as Plaintiff."

Def. br. at p. 16-17.  This argument is unavailing.  In the warnings issued to King, she was explicitly advised that *all* employees were to arrive by 7:20 a.m.  Def. Exhs. I, J. There is sufficient evidence that Huneryager and Fortuna were treated more favorably than King for the same conduct.

Defendant offers legitimate, nondiscriminatory reasons for firing King.  Defendant states that King was fired due to her lengthy history of tardiness.  In addition, her record contains warnings regarding carelessness on the job and her refusal to take direction from management.  Defendant says at times, King was late for work just days after being warned of tardiness.

King, however, rebuts Defendant's proffered reasons. King cites the fact that Huneryager and Fortuna were not fired or even disciplined despite their persistent tardiness to show, via the third method of proving pretext, that other employees outside her protected class were treated more favorably even though they engaged in substantially identical conduct.  A reasonable jury could infer from this evidence that King's tardiness was insufficient to warrant her termination and that Defendant discharged her because of her race.

Defendant's motion for summary judgment on this claim is **DENIED**.

V.    **CONCLUSION**

Defendant's Motion to Strike the Declaration of Jonathan Berns and Exhibits 11, 19 and 21 to Plaintiff's Omnibus Response and Plaintiffs' Motion to Strike Exhibit A Attached to Defendant's Omnibus Reply Brief are **DENIED**.

Defendant's Motion for Summary Judgment is **GRANTED** on the following claims:

| | | |
|---|---|---|
| i. | Lorenza Threatt | •constructive discharge |
| ii. | Sandra Bell | •failure to promote to Management Assistant<br>•retaliation |
| iii. | Rinell Starks | •failure to promote to Assistant Branch Manager |
| iv. | Catherine Stabler | •failure to promote to Management Assistant |
| v. | Arthur Henderson | •constructive discharge<br>•failure to promote to Management Assistant<br>•failure to promote to Assistant Branch Manager (July 2002)<br>•failure to promote to Account Executive |

| vi. | Demetrius Brock | •failure to promote to Management Assistant<br>•failure to promote to Branch Manager at<br> Branch A4 |
| vii. | Deborah Wells | •failure to promote to Management Assistant<br>•discriminatory discharge<br>•retaliation |
| viii. | Michelle Wilson | •failure to promote to larger branch<br>•discriminatory discharge<br>•retaliation |
| ix. | Krystal King | •failure to promote to Management Assistant |

Defendant's Motion for Summary Judgment is **DENIED** and trial will proceed on the following claims:

| i. | Lorenza Threatt | •failure to promote to Assistant Branch<br> Manager |
| ii. | Sandra Bell | •failure to promote to Assistant Branch<br> Manager |
| iii. | Lois Wilson | •failure to promote to Branch Manager<br>•discriminatory discharge |
| iv. | Catherine Stabler | •discriminatory discharge<br>•retaliation |
| v. | Arthur Henderson | •failure to promote to Assistant Branch<br> Manager (September/December 2002) |
| vi. | Demetrius Brock | •failure to promote to Branch Manager |
| vii. | Deborah Wells | •failure to promote to Assistant Branch<br> Manager |
| viii. | Krystal King | •discriminatory discharge |

**IT IS ORDERED.**

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  June 21, 2007

The undersigned certifies that a copy of this
document was served on the attorneys of
record by electronic means or U.S. Mail on
June 21, 2007.

S/Linda Vertriest
Deputy Clerk